United States Court of Appeals,

Fifth Circuit.

No. 95-30075.

Wade E. ROGERS, Plaintiff-Appellant,

v.

INTERNATIONAL MARINE TERMINALS, INC., Defendant,

and

International Marine Terminals, erroneously designated as
International Marine Terminals, Inc., Defendant-Appellee.

July 12, 1996.

Appeal from the United States District Court for the Eastern
District of Louisiana.

Before JOLLY, JONES and BENAVIDES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Wade E. Rogers ("Rogers") appeals the district court's grant
of summary judgment to his former employer, International Marine
Terminals ("IMT"), on Rogers' claims of employment discrimination.
Rogers sought relief under the Americans with Disabilities Act
("ADA") and § 510 of the Employee Retirement Income Securities Act
("ERISA") after he was terminated during a reduction in force
("RIF") at IMT. On his ADA claims, the district court held that
Rogers was not disabled for purposes of the ADA, that he was
nevertheless not qualified for his position, and that he was not
discriminated against because of his association with his disabled
wife. The district court denied his ERISA claim, holding that
evidence of IMT's specific intent to discriminate was lacking.
After reviewing de novo the summary judgment to IMT, this court

1

AFFIRMS. We also hold that Rogers was not a qualified employee under ADA because he was not able to attend work at the time he was terminated, and IMT was not required to make reasonable accommodation in the form of an indefinite leave of absence.

BACKGROUND

Rogers was employed by IMT from 1984 to 1993, and worked as a Class I mechanic with the company from 1990 until his layoff in 1992. In October 1992, Rogers took paid sick leave for the treatment of persistent pain, swelling, and other problems in his right ankle attributable to bone spurs, ligament damage, and gout. After using all of his sick leave, Rogers received a year of disability benefits pursuant to a disability plan sponsored by IMT. Rogers had surgery to correct the problems with his right ankle, but was not released for work by his physician until December of 1993. He obtained employment elsewhere.

Early in January of 1993, while Rogers was unavailable for work, IMT began to implement a RIF with the goal of laying off at least 25 employees by the end of March. Rogers and five other employees were terminated. According to IMT's Vice-President of Operations, Thomas Lange ("Lange"), Rogers was fired because of his prior absenteeism and his unavailability for work since October of 1992.

Rogers's wife is afflicted with Crohn's disease, which requires her to take parenteral nutrition. Medicare paid for

2

nutritional formulas for Mrs. Rogers.[1]  IMT's Group Employee Benefit Plan ("Benefit Plan") specifically excluded "nutrients/nutritional supplements provided as an inpatient or outpatient beyond 30 months of the initial treatment of an illness or injury."  Because of this exclusion, IMT never paid for Mrs. Rogers' nutritional formulas or treatments.  Eight months after Rogers's termination, however, IMT amended its Benefit Plan, effective the preceding January to cover nutrients or nutritional supplements when such supplements are "prescribed by a medical doctor for life sustaining purposes."

Rogers filed suit against IMT alleging that the company violated the ADA by terminating him because of (1) his alleged disability;  (2) the perception, albeit inaccurate, that he was disabled;  and (3) his association with his disabled wife.  Rogers further alleged that IMT violated ERISA by terminating him with the specific intent to prevent him from exercising his rights under IMT's Benefit Plan. The district court's rejection of the claims as a matter of law prompts this appeal.

DISCUSSION

I. *Standard of Review*

We review the district court's grant of judgment as a matter of law de novo, employing the same criteria used in that court. *Burfield v. Brown, Moore & Flint, Inc.,* 51 F.3d 583, 588 (5th Cir.1995).  Summary judgment is proper only "if the pleadings,

---

[1]The cost of such parenteral nutrition approaches $100,000 yearly.

3

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Factual questions and inferences are viewed in the light most favorable to the nonmovant. *Lemelle v. Universal Mfg. Corp.,* 18 F.3d 1268, 1272 (5th Cir.1994).

II. *ADA Claims*

A. *Actual Disability*

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As a threshold requirement in an ADA claim, the plaintiff must, of course, establish that he has a disability. *De la Torres v. Bolger,* 781 F.2d 1134, 1136 (5th Cir.1986).

The ADA defines a disability as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or © being regarded as having such an impairment.

42 U.S.C. § 12102(2). The pertinent inquiries are therefore whether Rogers had a physical or mental impairment, and, if so, whether it substantially limited one or more of his major life activities. *See, e.g., Dutcher v. Ingalls Shipbuilding,* 53 F.3d

4

723, 725-26 and n. 4 (5th Cir.1995) (noting that ADA and Rehabilitation Act definitions of "disability" are substantially equivalent); *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 722 (2d Cir.1994). The parties agree that Rogers' ankle problems constituted a physical impairment.

The dispute is whether Rogers's ankle problems substantially limited his major life activities of standing, walking, and working.[2] Under the ADA, not all limitations are substantial; Rogers's difficulties with his ankle do not substantially limit him unless they render him

> (i) Unable to perform a major life activity that the average person in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

29 C.F.R. § 1630.2(j)(1). In the instant case, there is no evidence that Rogers's impairment substantially limits his ability to stand and walk. For instance, an occupational therapist evaluated Rogers after surgery as having "good body mechanics," "fluid transitional movement into/out of squatting, crouching, kneeling, and crawling," and a "tolerance for standing and sitting."

---

[2]Rogers also contends that his impairment substantially limited his major life activity of climbing. While not an exhaustive list, "[m]ajor life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1995); *Dutcher,* 53 F.3d at 726 n. 7. Climbing is not such a basic, necessary function and this court does not consider it to qualify as a major life activity under the ADA.

Rogers also contends that his ankle impairment substantially limits his ability to work. To support this contention, Rogers stresses that he continues to suffer from a 13% permanent, partial disability to his entire body. However, there is no evidence to connect this impairment with an inability to perform numerous jobs or other of life's ordinary functions; absent such evidence, the mere existence of a 13% permanent, partial disability does not demonstrate that Rogers has been substantially impaired from performing a major life activity. Importantly, Rogers acknowledges that before surgery, he was able to work at IMT without any limitation and that his condition improved after the ankle operation. Also, the therapist concluded that Rogers has the current functional capacity for heavy work and has the ability to perform without any restriction his previous duties, including welding, fitting, and millwrighting.

In sum, Rogers's ankle afflictions were temporary and did not constitute a permanent disability; Rogers conceded as much in his affidavit to the EEOC. The EEOC regulations concur that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." 29 C.F.R. § 1630.2(j) (Appendix). A wide range of afflictions, many considerably more severe than Rogers's surgically correctable and now corrected ankle difficulties, do not constitute disabilities under the ADA; for example, a " "borderline' case of cerebral palsy that only slightly interferes with an individual's ability to read ... and to speak ... is not a disability." *EEOC*

6

*Compliance Manual,* § 902.4(c)(1). The record is bereft of support for Rogers's claim that the physical impairments imposed by the problems with his ankle are either chronic or severe enough to constitute a disability under the ADA.

Furthermore, even assuming Rogers was disabled for purposes of the ADA, he did not demonstrate both that he was a "qualified individual" and that IMT could accommodate his disability reasonably. The ADA defines a "qualified individual with a disability" as "an individual who, with or without accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Hence, this court considers whether Rogers could "perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue," and, if not, whether "any reasonable accommodation by the employer would enable [him] to perform those functions." *Chandler v. City of Dallas,* 2 F.3d 1385, 1393-94 (5th Cir.1993).

When Rogers was terminated effective January 6, 1993, he acknowledges that he was unavailable for work, recuperating from elective ankle surgery performed a month earlier. In fact, Rogers remained unavailable for work until released by his physician in December of 1993. Because Rogers could not attend work, he is not a "qualified individual with a disability" under the ADA. As several courts have recognized, "[a]n essential element of any ... job is an ability to appear for work ... and to complete assigned tasks within a reasonable period of time." *Carr v. Reno,* 23 F.3d

7

525, 530 (D.C.Cir.1994). *See also, Tyndall v. Nat'l Educ. Centers, Inc. of Cal.,* 31 F.3d 209, 213 (4th Cir.1994) (an employee "who does not come to work cannot perform any of his job functions, essential or otherwise.").

Moreover, Rogers cannot demonstrate that IMT could reasonably accommodate his purported disability. While Rogers contends that IMT was required to accommodate him by allowing him to enjoy indefinite leave, this argument is meritless. As the Fourth Circuit recently explained,

> Nothing in the text of the reasonable accommodation provision requires an employer to wait an indefinite period for an accommodation to achieve its intended effect. Rather, reasonable accommodation is by its terms most logically construed as that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in question.... *[R]easonable accommodation does not require [an employer] to wait indefinitely for [the employee's] medical conditions to be corrected....*

*Myers v. Hose,* 50 F.3d 278, 283 (4th Cir.1995).

B. *Perceived Disability*

In the alternative, Rogers urges that IMT violated the ADA by firing him due to the perception, albeit inaccurate, that he was disabled.[3] The district court found no evidence to support this perception, emphasizing that Rogers openly assessed his condition as temporary and that Michael Carter, Rogers' supervisor while at IMT, testified that he never considered or perceived Rogers as truly disabled.

---

[3]Of course, the facts, already discussed, that Rogers was unavailable for work and that he cannot demonstrate that IMT could accommodate him reasonably also dispose of his claim that he was terminated because he was perceived as disabled.

The ADA protects individuals who are regarded or perceived as disabled from employment discrimination. The ADA's definition of "disability" includes any individual that is "regarded as having ... an impairment" that substantially limits one or more of his major life activities. 42 U.S.C. § 12102(2).[4] But as the district court correctly concluded, the record does not establish that IMT regarded or perceived Rogers as disabled and that it discriminated against him on this basis. Similarly, the assertion that IMT regarded Rogers as disabled because of his chronic absenteeism is unsupported. In July of 1991, Rogers was indeed counseled for his absenteeism, but from the date of that counseling until October of 1992, IMT's records document not a single instance of absenteeism by Rogers. Quite simply, Rogers did not hold himself out to IMT as suffering from a disability; IMT did not regard or perceive Rogers as disabled; and the record does not contain evidence demonstrating otherwise. As a result, the district court properly awarded IMT summary judgment on Rogers's claim that he was terminated because IMT perceived him as disabled.

Rogers makes a related assertion that IMT "wrongfully" perceived him as disabled because of his absenteeism. Rogers cites an ADA implementing regulation that describes attitudinal barriers of employers toward disabled individuals, including "concerns

---

[4]In part, this provision is intended to combat "attitudinal barriers that frequently result in employers excluding individuals with disabilities. These include concerns regarding productivity, safety, insurance, liability, attendance, cost ... and acceptance by coworkers and customers." Comment, 29 C.F.R. § 1630.2(1).

regarding productivity, safety, insurance, liability, *attendance*...." Comment, 29 C.F.R. § 1630.2(1) (emphasis added). Rogers misreads this regulation. The regulation prohibits discrimination on the basis of *unfounded* concerns about disabled people. Here, the concerns about Rogers's unavailability to work from October 1992 to January 1993 and beyond were very real.

C. *Association with a Disabled Person*

Rogers also asserts that IMT unlawfully terminated him because of his association with his disabled wife. The ADA prohibits employers from taking adverse employment action "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). For instance, an employer cannot make an adverse employment decision based on the "belie[f] that the [employee] would have to miss work" in order to care for a disabled person. *See, e.g.,* Comment, 29 C.F.R. § 1630.

Although IMT knew that Mrs. Rogers has Crohn's disease, there is no evidence to substantiate the assertion that IMT terminated Rogers because of his association with her. While IMT was aware that Rogers occasionally missed work to care for his wife, the record does not suggest that IMT fired Rogers for that reason. In fact, before Rogers was counseled for his absenteeism in July of 1991, Carter wrote a memorandum to Lange discussing this absenteeism and attributing all of the absences to Rogers's, not his wife's ailment. Later, Lange recommended counselling for Rogers's absenteeism, which Lange likewise attributed exclusively

10

to Rogers's own health problems.  The record contains no evidence that the absences that, in part, led to Rogers' discharge were attributed to his wife's disability in any way.  Because there is no genuine, material fact issue on this claim, judgment as a matter of law in favor of IMT was proper.

III. *ERISA Claim*

Last, Rogers argues that IMT terminated him to eliminate from its employee health benefit program the prospective costs of his wife's medical treatment, especially those incurred by her parenteral nutrition.  But IMT had never borne any of those costs; Medicare paid for the costs of these nutritional formulas for Mrs. Rogers.  As noted earlier, the Benefit Plan specifically excluded parenteral nutrition from coverage while Rogers worked for IMT. Undaunted, however, Rogers points out that after his termination, IMT amended its Benefit Plan to cover nutrients or nutritional supplements "prescribed by a medical doctor for life sustaining purposes."  From this subsequent amendment, Rogers infers that IMT terminated him intentionally to prevent him from enjoying this coverage for his wife.

To establish a prima facie case under § 510 of ERISA, Rogers must prove that IMT, acting with specific discriminatory intent, retaliated against him or his wife for filing medical claims interfered with any right to which Rogers may have become entitled under the Benefit Plan.  *See, e.g.,* 29 U.S.C. § 1140.  *See also, Hines v. Mass. Mutual Life Ins. Co.,* 43 F.3d 207, 209 (5th Cir.1995) ("[a]n essential element of a Section 510 claim is proof

11

of defendant's specific discriminatory intent."); *McGann v. H & H Music Co.,* 946 F.2d 401, 404 (5th Cir.1991), *cert. denied,* 506 U.S. 981, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992).

As before, there is no evidentiary support for Rogers' assertion.[5] To the contrary, the record demonstrates a nondiscriminatory reason for IMT's decision to amend the Benefit Plan; the company sought to insure the cost of nutritional supplements for an employee who was terminally ill. IMT, as an employer, has the right to amend its Benefit Plan in this fashion and is free to modify the terms and conditions of benefit plans offered to employees. *See* IMT Benefit Plan § 20; *see also McGann,* 946 F.2d at 407 ("ERISA does not broadly prevent an employer from "discriminating' in the creation, alteration, or termination of employee benefit plans."). Also, by the time IMT amended its Benefit Plan, Rogers was no longer a participant, as he was a *former* employee. Because Rogers offered no evidence that IMT specifically intended to deprive him of a right to which he was entitled under the company's Benefit Plan, summary judgment for IMT was warranted.

CONCLUSION

---

[5]Indeed, even assuming Mrs. Rogers had a valid claim under the Benefit Plan, IMT could have attempted to limit her claims by terminating Rogers for his absenteeism. The Benefit Plan expressly provides that "[c]overage will terminate for an employee on the ... [d]ate employment terminates." Benefit Plan § 16. Should IMT have terminated Rogers in this manner, Mrs. Rogers would have had the right to continue coverage for herself, provided her spouse's termination was "for reasons other than gross misconduct" and if she had informed IMT in writing within 60 days from the date of Rogers' termination of her intent to continue coverage. Benefit Plan § 17.

12

For the foregoing reasons, the decision of the district court granting summary judgment in favor of IMT on all of the claims asserted against it by Rogers is AFFIRMED.