**Lawrence A. MITCHELL, Jr., Plaintiff,**

v.

**WASHINGTONVILLE CENTRAL SCHOOL DISTRICT, Defendant.**

**No. 96 CV 1985(BDP).**

United States District Court, S.D. New York.

Jan. 30, 1998.

Robert E. DiNardo, Jacobowitz & Gubitz, Walden, NY, for Plaintiff.

Jay M. Siegel, Shaw & Perelson, LLP, Poughkeepsie, NY, for Defendant.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

### INTRODUCTION

Plaintiff, Lawrence Mitchell, an amputee, and the former head custodian at the Washingtonville High School, claims that by failing to afford him a "reasonable accommodation" for his disability, the Washingtonville Central School District violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

Mitchell finds himself in a difficult position: to maximize his chances for (perhaps badly needed) disability and social security benefits, he must emphasize the debilitating nature of his impairment and prove to the Social Security Administration ("SSA") and the Workers' Compensation Board his inability to work. But to succeed on his ADA

claim, he must turn 180 degrees and contend that, notwithstanding his disability, he could perform his job if only offered a "reasonable accommodation." For the reasons that follow, the Court concludes that Mitchell is estopped to make this turn and that the defendant's motion for summary judgment should be granted.

A motion for summary judgment should only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hayes v. New York City Dep't. of Corrections,* 84 F.3d 614, 619 (2d Cir.1996); *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). The court is to perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos,* 831 F.Supp. 1079, 1082 (S.D.N.Y.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Hayes,* 84 F.3d 614 at 619.

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities in the light most favorable to, and draw all reasonable inferences in favor of, the party opposing the motion. *Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 382 (2d Cir.1996); *In re State Police Litigation,* 88 F.3d 111, 123 (2d Cir. 1996); *Hayes,* 84 F.3d at 619; *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). With these standards in mind, the following facts are assumed for purposes of this motion.

## BACKGROUND

Mitchell's right leg was amputated above the knee following an automobile accident in 1977. In 1987, he began working as Head Custodian for Washingtonville High School, having taken and passed the Civil Service exam for Head Custodian while working as a custodian for the McNally School in Goshen, New York. At the time he took the Civil Service examination, plaintiff considered himself capable of performing all of the physical tasks described in the relevant job specification and so stated during his interview for the job. Head Custodian positions are district-wide positions and the District could, in its discretion, reassign Head Custodians among the various schools in the District.

The relevant job specification for Head Custodian provides in part:

This is important work involving responsibility for supervising and performing routine building cleaning and semi-skilled maintenance tasks. Work is carried out in accordance with established procedures and involves the general supervision, care, maintenance and protection of a school building which may include the efficient performance of a variety of groundskeeping activities.

Under "typical work activities," the classification lists:

Supervises and performs a variety of daily cleaning chores such as sweeping, dusting, waxing, mopping, window washing, etc.;

Supervises and makes minor repairs to furniture, equipment and building such as replacing broken windows, replacing light bulbs and fuses, repairing door latches, adjusting seats and desks, etc.;

Plans and schedules work assignments for regular cleaning and maintenance of buildings;

May be responsible for or assist in grounds keeping activities such as mowing lawns, cultivating trees and shrubs, collecting paper and rubbish, removing snow, etc.;

May operate and perform maintenance on heating and ventilation systems;

Ensures that adequate supplies of soap, toilet paper, towels, etc. are available and placed in proper holders at all times;

May perform a variety of miscellaneous activities consistent with the effective operation of a school building such as ensuring clocks are regulated for proper time, oiling and greasing mechanical equipment, inspecting roof, delivering packages, storing supplies, acting as nightwatchman, etc.

One of the requirements of the position is "physical condition commensurate with the demands of the position."

Plaintiff described the essential functions of his job as follows:

> Supervising and performing daily cleaning chores such as sweeping, dusting, mopping, window washing, supervising and making minor repairs to furniture, equipment and parts of the building such as replacing broken windows, light bulbs, fuses, door latches, adjusting furniture, et cetera, planning and scheduling work assignments for regular cleaning and maintenance of the building. May be responsible for or assistance in [sic] the grounds keeping, may operate and perform maintenance on the HV system, keeping adequate supplies of soap, toilet paper, paper towels, tissues, that sort of thing, cleaning supplies, delivering packages, inspecting the building, inspecting the grounds, inspecting the roof, making security checks and in addition to that, noticing correct cleaning practices and some of the maintenance practices, so that the subordinates could be trained properly.

Plaintiff acknowledged that when he was first hired as Head Custodian, he typically spent two hours each day doing office work at his desk, taking a fifteen minute coffee break and a half hour lunch break. Other than that, he spent the remainder of his 8 1/2 hour day on his feet performing his various duties.

Starting in 1989, plaintiff spent less time engaged in clerical duties, spending three days each week (except for his coffee and lunch breaks) entirely on his feet. This was consistent with the amount of time the custodians under plaintiff's supervision remained on their feet.

As far as his work during this period was concerned, plaintiff contends that he did not always perform all of the activities described as "typical" in the Head Custodian job description. For example, he did not clean the upper levels of windows or replace light bulbs because he could not climb ladders, and he did not routinely clean classrooms or assist floor crews. In any event, Mitchell acknowledges that at work he spent considerable time on his feet and that many of the duties of the Head Custodian could not have been performed from a sitting position.[1]

Within four months after plaintiff began working at the High School, he experienced swelling and pain in his stump. On June 8, 1987, after two days of swelling and pain, he was examined by an orthopedic physician, Dr. Robert Kulak, who diagnosed swelling and swollen glands in plaintiff's groin, drained fluid from his stump, and put him on antibiotics. In September 1987, plaintiff again experienced swelling and was treated by Dr. Kulak's partner, Dr. Mayefsky. Fluid was again drained from plaintiff's stump. Following these treatments, plaintiff was unable to wear his prosthesis for a period of time. Several years later, in October 1991, Dr. Kulak again examined plaintiff, this time because of a painful lump on the outside of his stump. Dr. Kulak drained a "yellowish turbid fluid from his stump" and told plaintiff not to wear his prosthesis until the end of November 1991.

Plaintiff's problems with his stump were caused by the need to wear and use his prosthesis at work. Because the Head Custodian job required extensive physical activity, plaintiff suffered approximately three skin breakdowns on his stump each year for three to four days each time. When this happened, plaintiff would wear his prosthesis only at work. Plaintiff contends that he would take occasional sick leave as a result of his problems, which would be reported to the District's Personnel Department and to his immediate supervisor. Plaintiff also contends that on a few occasions, James Rath-

---

1. Duties that required plaintiff to stand included: inspection of certain areas of the High School; daily unloading of trucks; moving materials, including full 55 gallon drums, five gallon pails, and furniture; scrubbing, buffing, and mopping floors; cleaning the tops of windows; dusting high places; vacuuming; hauling large bags of garbage; assisting maintenance staff in moving heavy parts; shoveling snow, operating a snow blower, and salting sidewalks; inspecting the roof; changing the ballasts on fluorescent lighting fixtures; carrying and cutting sheetrock; lifting and balancing heavy pieces of furniture for repair; and repairing the bleachers in the high school gym.

bun, the District's Assistant Superintendent for Business Affairs, and Samuel Black, the High School Principal, told plaintiff that they would regard any complaints by him concerning his amputated leg as "insubordination."

In 1993, the High School expanded to about twice its previous size. This expansion greatly exacerbated plaintiff's problems with work: after the expansion, plaintiff's job required considerably more walking and physical labor, causing plaintiff significant additional trouble with his stump. On November 5, 1993, plaintiff worked a twelve hour day, at the end of which he moved cafeteria furniture. Since all of the day's activity required him to stand, his leg began to drain, causing considerable pain. The following Monday, November 8, 1993, the plaintiff stopped reporting to work. He subsequently reported to the District that he had been injured on the job.

APPLICATION FOR WORKERS' COMPENSATION

Around January 6, 1994, plaintiff filed an Employee Claim for Compensation with the New York Workers' Compensation Board. On the claim form, plaintiff stated that he had been injured on November 5, 1993 and could not work: "Because of strenuous walking claimant developed a wound and abcess [sic] on right leg where prostices [sic] and leg meet." On February 8, 1994, the District controverted plaintiff's claim, contending that "[n]o accident within the meaning of the law" had occurred, and questioning whether plaintiff's disability arose "in and out of the course of employment."

On June 22, 1994, Workers' Compensation Law Judge Robert Gaffigan held a hearing on plaintiff's claim, at which plaintiff was represented by counsel. At the hearing, plaintiff testified that his Head Custodian job required him to walk "quite extensively" and also required "a lot of physical labor." Plaintiff stated that with the exception of emergencies, he could not delegate his responsibilities to his staff. He also described the

circumstances of the "accident" that occurred on November 5, 1993.

On October 20, 1994, Dr. Kulak's office issued an Attending Doctor's progress report to the Workers' Compensation Board based on an October 6, 1994 evaluation of plaintiff. In that report, Dr. Kulak indicated by placing an "x" in the appropriate box that plaintiff was suffering a "total disability," that plaintiff's stump was satisfactory, his new prosthesis was "OK," and plaintiff could work in a sitting position.[2]

In a decision dated November 4, 1994, Judge Gaffigan found that plaintiff had suffered an injury to his right leg stump and medial thigh on November 5, 1993. He awarded the plaintiff $362.97 as a tentative rate for total disability for November 9, 1993 to July 27, 1994, pending establishment of a permanent average weekly rate. The District objected to this decision on the grounds of, *inter alia,* the degree of disability.

On February 26, 1995, the Workers' Compensation Board affirmed Judge Gaffigan's decision, holding that the plaintiff was "totally disabled" from November 9, 1993 to July 27, 1994 and declining to hear additional medical testimony on the issue. In support of its decision, the Board cited Dr. Kulak's reports of his medical examinations of plaintiff from January 20 through October 6, 1994, which indicated that plaintiff was "totally disabled." The Board also cited reports of Dr. Roger Newman, the District's consultant, who stated on April 27, 1994 that plaintiff "remains fully disabled at this time for any activities that require ambulation with prosthesis on the part of the patient." In a subsequent June 6, 1994 report, Dr. Newman noted:

it is within the realm of possibility that this patient could return to his supervisory activities using a wheelchair or crutches and could function exclusively in a supervisory capacity involving only those items which did not require climbing and other types of

---

**2.** In his deposition, Dr. Kulak denied that the assessment of total disability was based upon any careful consideration of the issue:

The form that was checked to begin with was checked by my secretary based on information

provided in the note. Perhaps a question or two she asked me. It varies each time with each patient. Presumably the answer was given in a totally abstract manner, an arbitrary manner.

activity on his part that would require the use of both legs.

On November 23, 1994, Dr. Newman submitted another report to the administrator of the District's Workers' Compensation insurance program. While stating that plaintiff was "able to work at the present time and is no longer disabled," Dr. Newman cautioned against a return to plaintiff's former position:

It must be said that if he attempts to return to the present job that he will be at serious risk for breakdown of skin of the right stump and will essentially reverse all that has been accomplished over the preceding many months, in the way of healing of the skin breakdown of the right above knee amputation stump.

To phrase the situation in another way, had the building been of the size and extent that it is today, at the time that the patient initially took the job, then the patient at that time would have found that the job was beyond his ability because of the extent of ambulation that would be required.

It has been recommended by the patient's primary treating doctor, Dr. Kulak, that he should be retrained for a job that is more sedentary versus a job that requires frequent ambulation. I must state that I concur wholly with the recommendation.

On March 7 and June 19, 1996, Workers' Compensation Law Judge John Paksarian held additional hearings regarding the degree of plaintiff's disability after July 27, 1994. In these hearings, Dr. Kulak testified that after July 1994, he felt that plaintiff "would have to be in a situation where he can control the amount of walking, the standing, at whatever occupation or activity he would pursue." Dr. Kulak indicated that there was no acute problem with plaintiff's stump as of September 1995.

In a decision dated October 10, 1996, Judge Paksarian found that plaintiff had a permanent partial disability. He found that by November 23, 1994, plaintiff had recovered from the prior problems with his stump and had a newly-fitted prosthesis. At that time, however, plaintiff remained under permanent restriction to a sedentary job, pursuant to Dr. Newman's report of November 23, 1994. Judge Paksarian also cited Dr. Newman's April 3, 1995 report, in which Dr. Newman stated that plaintiff's condition would never be entirely "status quo ante" because the level of scarring on his stump was greater than when he began work for the District and the scars would be more prone to break down over time than the healthy adjacent skin. Judge Paksarian further concluded that plaintiff's disability was "ongoing in nature, because if the claimant walks excessively, he will again experience skin breakdown and ulceration." Judge Paksarian continued the case for average weekly wage and proper awards. Plaintiff alleges that he received only six months of Workers' Compensation benefits.

## APPLICATION FOR SOCIAL SECURITY BENEFITS

During the pendency of his Workers' Compensation claim, plaintiff also applied for Social Security disability benefits. In his April 4, 1994 Application for Disability Insurance Benefits, the plaintiff stated: "I became unable to work because of my disabling condition on November 10, 1993. I am still disabled." He agreed to notify the SSA if his condition improved enough to enable him to work, and signed the form under a statement that warned:

I know that anyone who makes up or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under federal law by fine, imprisonment or both. I affirm that all information I have given in connection with this claim is true.

Similar warnings appeared on other Social Security forms signed by plaintiff.

In his April 4, 1994 disability report for SSA, plaintiff circled the appropriate numbers to indicate that his job involved eight hours a day of walking and standing, zero to one hours a day of sitting, frequent bending and reaching, and lifting and carrying boxes of supplies weighing fifty pounds or more. In a form received by the SSA on April 29, 1994 and prepared from Dr. Kulak's medical reports, Dr. Kulak indicated with an "x" in

the proper categories that plaintiff could not lift and carry more than fifteen pounds, could stand and/or walk up to six hours per day, could sit without limitation, and could push and pull only with his upper extremities.

In connection with plaintiff's application for disability insurance, Dr. Deborah Bostic, a medical consultant for the SSA, reviewed Dr. Kulak's medical reports of plaintiff and concluded that plaintiff could occasionally lift and/or carry twenty pounds, could frequently lift and carry ten pounds, could stand and walk about six hours of an eight hour work-day, and had an unlimited capacity to push and pull. She also noted that while plaintiff's infection was severe, it was not expected to last one year.

On May 5, 1994, the SSA notified plaintiff that he was not entitled to disability benefits because his condition was not expected to remain severe enough for twelve consecutive months to prevent him from working. SSA stated that it expected that within a year plaintiff could perform light work. On July 22, 1994, with the help of his attorney, plaintiff signed a Request for Reconsideration of SSA's decision to deny him benefits, stating: "I am totally disabled and unable to engage in any type of gainful employment due to being on my feet for long periods of time which resulted in a cyst." On September 15, 1994, the SSA notified plaintiff that it had affirmed the denial of his claim.

On October 17, 1994, plaintiff signed a Request for Hearing by Administrative Law Judge to appeal the denial of his claim for Social Security benefits. He stated that he disagreed with the determination made on his claim because "I am totally disabled and unable to engage in gainful employment due to being an amputee, my right leg from the knee down. This disability enables me [sic]

from any type of prolonged standing or ambulation." On this form plaintiff indicated that he had not worked since his Request for Reconsideration was filed and that there had been no change in his condition or in his daily activities and/or social functioning since that date.

A few weeks before, on or about October 5, 1994, plaintiff had received a new prosthesis. Within a month, he was fully ambulatory and within five to six weeks, he was comfortable with the new prosthesis. In his November 18, 1996 deposition, plaintiff testified that by the middle of November 1994, he had received his new prosthesis and begun walking on it. He testified that he felt that at that time he was no longer totally disabled. This testimony, however, is not consistent with other representations by plaintiff.[3]

On May 24, 1995, the SSA sent a Notice of Hearing to plaintiff, scheduling a hearing for July 6, 1995 before Administrative Law Judge Thomas Dorsey to determine whether plaintiff was eligible to collect disability payments and disability insurance benefits under the Social Security Act. At the request of plaintiff's attorney, Dr. Kulak filled out the form regarding plaintiff's medical condition.[4] On that form, under "Diagnosis," Dr. Kulak wrote: "Difficulty and limitation with standing beyond short length of time with prosthesis; pain & injury to groin." In response to a question regarding functional limitations that would interfere with the ability to hold a job, Dr. Kulak noted that plaintiff "cannot stand beyond short period of time. Damages skin inner aspect of right groin [sic]."

In response to a question whether plaintiff could work five days a week, full time, seated for at least six hours in an eight hour day frequently lifting up to five pounds and occa-

---

3. On November 17, 1994, for example, Mitchell filed a New York State Accidental Disability Retirement Application for Article 15 Disability Retirement. In this application, plaintiff stated that he was "permanently disabled because of injuries to right residual limb (existing A–K–Amputation) and recurrences" and that he was "physically or mentally incapacitated for performance of gainful activity as the natural and proximate result of an accident sustained in the performance of [his] duties." Plaintiff considered himself unable to perform his duties in the sense that he was

unable to return to his "exact same position." Plaintiff's Disability Retirement Application was denied on the basis that plaintiff had not had an "accident" under section 605 of the Retirement and Social Security law.

4. The date of this form is unclear. While Dr. Kulak apparently signed it on June 24, 1995, the form indicates that plaintiff was last seen on June 29, 1995, subsequent to the signing of the form.

sionally lifting ten pounds, Dr. Kulak wrote: "*No.* Must be seated while working—all the time." He added that plaintiff was incapable of working five days a week, seated for six hours in an eight hour day, frequently lifting ten pounds and occasionally lifting twenty pounds: "*No. Cannot* stand for 2 hours." This form, together with Dr. Kulak's Attending Doctor's progress reports of October 20, 1994 and July 5, 1995 was submitted to the SSA in support of plaintiff's disability reconsideration claim. The July 5, 1995 progress report reads, in part: "6/29/95 stump healed, can not stand at work, pain lateral aspect left leg, groin injury from prothesis [sic], when stands breakdown of skin."

On July 6, 1995, Judge Dorsey held a hearing at which plaintiff was represented by counsel. In that hearing, in response to Judge Dorsey's question as to why plaintiff was unable to work, plaintiff responded, "I'm not sure I can get anything where I could just sit for the entire time I'd be working." He stated that he spent no more than a quarter of his waking hours off of crutches, and when asked how far he could walk with the crutches, stated: "I never measured, but I mean, I can cross the street here and go into a building, and that would be it before I'd have to stop a couple of minutes and sit down [indiscernible]." Plaintiff stated that he could stand for about five minutes at a time, could bend with difficulty, and could not kneel. He further stated that he could probably lift thirty pounds, but could not carry any weight at all.[5]

On August 4, 1995, Judge Dorsey found plaintiff "disabled" within the meaning of the Social Security Act. Specifically, he concluded that plaintiff had not engaged in substantial gainful activity since November 10, 1993, the date he was first under a "disability," and would continue to be unable to work through December 31, 1998. Judge Dorsey further found that plaintiff's "status post amputation of the right leg above the knee" qualified as a severe condition and met one of the impairments listed in the implementing regulations of the Social Security Act. He further noted that since November 10, 1993, plaintiff had been unable to use his prosthesis effectively because of the continued ulceration of his stump. Based on Judge Dorsey's findings, the SSA found that beginning in May 1994, plaintiff was entitled to monthly disability benefits from Social Security.[6] As of his deposition on November 18, 1996, plaintiff had not notified SSA of any improvements in his medical condition. As of July 1997, plaintiff was still receiving Social Security benefits.

## PLAINTIFF'S TERMINATION FROM THE DISTRICT

While these various proceedings were ongoing, the District terminated plaintiff as a Head Custodian. On September 14, 1994, Dr. Kulak wrote a letter "To Whom it May Concern," stating that plaintiff had been unable to return to normal work duties as of that date. He noted that he hoped to be able to determine a return to work date when he examined plaintiff on September 29. But in a letter dated October 6, 1994, Dr. Kulak stated that he had reexamined plaintiff and felt that "due to his above knee amputation and the need for use of a prosthesis . . . he should be retrained for a job that is more sedentary vs. a job that requires frequent ambulation." Plaintiff provided this letter to the District on December 6, 1994.

On November 16, 1994, Peter M. Brenner, Sr., the Superintendent of Schools, informed plaintiff that at the December 19, 1994 Board of Education meeting, he would recommend that plaintiff be terminated "in light of [his] inability to perform the duties of [his] position for in excess of one year's time." He requested that if any of the facts set forth in Dr. Kulak's September 14, 1994 letter were

---

5. In his November 18, 1996 deposition, plaintiff stated that in December 1994—six months before the Social Security hearing—he could be on his feet for about four hours a day using his prosthesis. He testified that his condition probably improved a little from December 1994 on, and that by June 1995, he could physically stand and walk on his prosthesis at work about five hours a day.

6. Plaintiff was entitled to the past due amount of $14,513.00, for May 1994 to August 1995; after that, plaintiff was entitled to monthly payments of $918.00.

inaccurate, plaintiff should respond in writing by December 6, 1994.

On December 6, 1994, plaintiff responded, enclosing Dr. Kulak's October 6 letter which suggested restructuring to a "more sedentary" job,[7] and stated that a possible return to Head Custodian might be possible if the position could be restructured to sedentary duties.[8] Plaintiff further directed that the District should "consider this letter a request for 'reasonable accommodation' as defined by the American Disabilities Act."

Plaintiff was terminated at the December 19, 1994 meeting of the District's Board of Education. On December 12, 1994, Maureen Comer, Director of Personnel for the District, wrote to plaintiff that the District had turned over to its attorney plaintiff's "request regarding accommodation if [he was] released from [his] doctor to return to work." Prior to plaintiff's termination, nothing further was done with respect to his request for reasonable accommodation.

One month after plaintiff's termination, Comer determined that the District should obtain an independent medical evaluation of the plaintiff's ability to perform the duties of the Head Custodian position, and an evaluation of what accommodations the District might make for the plaintiff.

On January 26, 1995, Comer contacted The Workplace, an agency that specializes in evaluating the ability of disabled individuals to perform the essential job functions of a position. On February 6, 1995, Comer informed plaintiff that the District had set up an appointment for a medical evaluation with The Workplace at the District's expense. She wrote: "Once we have a medical evaluation forwarded to us, we can better determine what accommodations, if any, can be made on your behalf given your present condition."

Plaintiff's attorney, however, contends that he was advised by defendant that defendant was not considering rehiring plaintiff and claims that this request was an attempt by defendant to establish a basis for rejecting plaintiff's request for a reasonable accommodation. Plaintiff informed defendant prior to February 17, 1995 that he would not participate in the medical evaluation.[9]

On September 11, 1995, Dr. Kulak performed a Physical Capacities Evaluation of plaintiff. He determined that over an eight-hour workday, plaintiff needed to sit for all eight hours and could not stand or walk. He noted that while plaintiff could lift up to twenty pounds continuously, and twenty-one to fifty pounds frequently, he could never lift fifty-one to one hundred pounds, and could never carry any weight, as carrying weight threw plaintiff's balance off. He indicated that plaintiff could not bend or squat, and could only occasionally crawl or climb. In addition, he determined that plaintiff could never drive automobile equipment, and required complete freedom to rest frequently without restrictions.

On November 16, 1996, plaintiff's vocational expert, Edmond Provder, a certified rehabilitation counselor, evaluated plaintiff for three hours to assess plaintiff's ability to perform the essential functions of the Head Custodian job. Provder has served as the president of Occupational Assessment Services, Inc. for sixteen years, and has provided vocational testimony in Social Security Disability hearings for eight years. In making his determination, Provder reviewed medical

---

**7.** In his deposition, plaintiff stated that he had trouble with the word sedentary because he understood it to mean "always sitting down," which he felt was an unnecessary accommodation for him. When Dr. Kulak told plaintiff that he would use the term in the sense of "more sedentary than frequent ambulation," plaintiff agreed to the word "sedentary."

**8.** During his deposition, plaintiff testified that a suitable "restructuring of job duties" would be to reassign his physical custodial duties to other or additional custodial staff.

**9.** On March 2, 1995, Comer wrote to The Workplace:

I am writing in response to your letter in which you requested clarification of the District's position and intentions in requesting that Lawrence Mitchell submit to a physical examination. The purpose of the District's request, was to confirm its decision that Mr. Mitchell was unable to perform the essential functions of the position of Head Custodian with a reasonable accommodation.

In her deposition, Comer suggested that "confirm" was the wrong word; what she really meant was "clarify."

records from Drs. Kulak and Newman; hospital records from 1978 and 1981; and Judge Dorsey's decision finding plaintiff disabled for the purpose of receiving Social Security benefits. He also performed a standard vocational interview and administered tests. From plaintiff's description of the Head Custodian job, Provder understood it as follows:

This occupation involved the supervision of between 9 and 25 maintenance and custodial workers in the high school. The employee numbers increase during the summer. He was responsible for building and some grounds maintenance. He supervised repairs and maintenance, such as painting, minor electrical repair, plumbing, carpentry, troubleshooting HVAC, and changing locks. He scheduled employees, ordered supplies, and coordinated after-hours usage of the building. In reality, he was a working supervisor who helped perform necessary repairs. The high school expanded to 240,000 square feet in 1993, doubling its size. This resulted in increased walking by Mr. Mitchell as well as more building activity. He used hand and power tools on this job.

Provder classified the Head Custodian job as Light to Heavy Work.

In his interview with Provder, plaintiff gave the following as his then-current physical capacity:

able to sit two hours and then has to stretch, able to stand 20 to 30 minutes, walk 30 minutes, able to climb two flight [sic] of stairs, able to lift 100 pounds, and can carry 20 pounds, and able to use both hands to grasp and manipulate objects. The dominant hand is the right. He is able to bend, and can kneel on one knee. He is unable to squat.

Based upon Provder's overall assessment of the plaintiff, he determined that from November 9, 1993 to October 15, 1994, plaintiff was unable to perform his job as Head Custodian. Regarding the period after October 15, Provder wrote: "After being fitted for his new prosthesis in 10/15/94, it is my expert

opinion that Mr. Mitchell was capable of performing the job duties as a Head Custodian."

In his deposition, Provder reiterated his conclusion that by October 15, 1994 plaintiff could perform his Head Custodian position. This conclusion was based on Provder's understanding that plaintiff's job as Head Custodian consisted mostly of standing and walking and was as plaintiff had described it to Provder. Provder further testified that he felt that after plaintiff had received his new prosthesis in October 1994, plaintiff could meet the physical demands of light work, which required standing and walking for at least six hours of an eight hour workday.

## DISCUSSION

### DISCRIMINATION UNDER THE ADA

■ In March 1996, plaintiff commenced this action, alleging that the District violated the ADA by failing to provide him with "reasonable accommodation" in light of his disability. A claim for disability under the ADA requires plaintiff to first establish a prima facie case, showing: (1) that he is handicapped under the disability acts; (2) that he is otherwise qualified to perform the job in question; and (3) that he was discharged because of his disability. *Wernick*, 91 F.3d at 383 (citing *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir.1994)). In order to show that he is handicapped, plaintiff must prove (1) that he has a physical or mental impairment; and (2) that his impairment substantially limits one or more of his major life activities. *Id.* In order to show that he is "otherwise qualified" for the job in question, plaintiff must be able to "perform the essential functions of that job, either with or without a reasonable accommodation." *Borkowski v. Valley Central School District*, 63 F.3d 131, 135 (2d Cir.1995).[10]

Under the Social Security Act, a claimant is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or men-

---

10. While *Borkowski* discussed application of the Rehabilitation Act, the substantive standards for such claims are identical to those of the ADA. See *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723,

727 n. 14 (5th Cir.1995); *Staron v. McDonald's Corp.*, 51 F.3d 353, 355–56 (2d Cir.1995); *Myers v. Hose*, 50 F.3d 278, 281 (4th Cir.1995).

tal impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is entitled to disability benefits:

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. § 423(d)(2)(A). If the claimant can show that his impairment meets or equals a listed impairment that the SSA has determined is "severe enough to prevent a person from doing any gainful activity," the claimant is considered *per se* disabled. 20 C.F.R. §§ 404.1520(d) and 404.1525(a); *Knipe v. Heckler*, 755 F.2d 141, 146 (10th Cir.1985). One of the listed impairments is "[i]nability to use a prosthesis effectively," the impairment that Judge Dorsey found applied to plaintiff here. Unlike the ADA, the Social Security Act does not address the effect of reasonable accommodation on the individual's claim. Likewise, New York Workers' Compensation Law makes no provision for reasonable accommodation in determining the level of disability or whether an individual is disabled.

## APPLICATION OF JUDICIAL ESTOPPEL

In this case, defendant challenges plaintiff's contentions that under the ADA he is "otherwise qualified" to perform the essential functions of the head custodian position. Defendant argues that plaintiff should be judicially estopped to assert this contention in light of the contradictory positions he took in prior proceedings before the Workers' Compensation Board and Social Security Administration.

Judicial estoppel, which is intended to "protect judicial integrity by avoiding the risk of inconsistent results in two proceedings," prevents a party in a judicial proceeding from taking a position contrary to one taken by the same party in a prior judicial, quasi-judicial, or administrative proceeding. *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir.1997) (citing *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037–38 (2d Cir. 1993)). The doctrine applies if the prior tribunal has accepted the claim at issue in a decision favorable to the claimant and when there has been a true inconsistency between the statements in the two proceedings. *Id.* at 72–73.

Our Court of Appeals has not addressed the precise issue presented by defendant, although it recently addressed a related question. *Simon v. Safelite Glass Corp., supra*, held that a litigant who claimed that he could not see for the purposes of claiming Social Security benefits was judicially estopped from later claiming under the Age Discrimination in Employment Act ("ADEA") that he was not fully disabled, but was in fact qualified to hold his previous job. *Id.* at 73–74. While the *Simon* court noted that a plaintiff seeking recovery under the ADEA had to show that he "was qualified to perform the duties required by the position" in question, the court did not address the possibility of "reasonable accommodation." *Id.* at 69. The court further "left for another day" whether judicial estoppel should *per se* bar a person from bringing suit under the ADA based on statements made in applying for Social Security benefits. *Id.* at 74.

Other courts have, however, addressed the question. A minority of courts, including the Third Circuit, have adopted a *per se* rule, holding that a plaintiff who asserts that he is totally disabled for the purpose of obtaining Social Security benefits is judicially estopped from asserting in a later claim under the ADA that he can perform the essential functions of his job with reasonable accommodation.[11] Other courts, however, including two in this District, have adopted a more measured response, and decline to impose a *per*

---

11. *See, e.g., McNemar v. Disney Store, Inc.*, 91 F.3d 610 (3d Cir.1996); *Reiff v. Interim Personnel, Inc.*, 906 F.Supp. 1280 (D.Minn.1995); *Nguyen v. IBP, Inc.*, 905 F.Supp. 1471 (D.Kan.1995). The Third Circuit, however, has since retreated from a *per se* rule, confining the holding in *McNemar* to its facts. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 n. 5 (3d Cir. 1997).

*se* rule. These cases, for the most part, rely on the material differences between the SSA and the ADA in defining "disability," and have held that a "total disability" for purposes of Social Security benefits does not automatically preclude a claim that an individual is a "qualified individual with a disability" under the ADA. All of the cases in the latter category, however, give some weight to a party's prior representations.[12]

Two courts in this District have thus far considered the relevance of prior representations in subsequent ADA proceedings. *See Mohamed v. Marriott International, Inc.*, 944 F.Supp. 277 (S.D.N.Y.1996); *Marvello v. Chemical Bank*, 923 F.Supp. 487 (S.D.N.Y. 1996). While not ruling out the possibility of judicial estoppel, both courts held that on the facts of the case in question, judicial estoppel was not warranted.

■ Following the majority view, I decline to apply a *per se* rule of judicial estoppel in this case. However, on its facts, I find that this case is one to which judicial estoppel should apply.

■ In this case, plaintiff, while represented by counsel, and his treating physician have made a number of sworn representations regarding plaintiff's condition to the SSA and the Workers' Compensation Board, both in writing and in administrative hearings. On forms during these proceedings, plaintiff stated: (1) "I [am] unable to work because of my disabling condition;" (2) "I am totally disabled and unable to engage in any type of gainful employment due to being on my feet for long periods of time which resulted in a cyst;" (3) "I am totally disabled and unable to engage in gainful employment due to being an amputee, my right leg from the knee down. This disability enables me [sic] from any type of prolonged standing or ambulation." While testifying in the July 1995 Social Security hearing, plaintiff stated that he could stand for about five minutes at one time. In response to Judge Dorsey's question as to why he was unable to work, plaintiff stated: "I'm not sure I can get anything where I could just sit for the entire time I'd be working."

Plaintiff's treating physician, Dr. Kulak, supported plaintiff's claims of disability.[13] In an evaluation of plaintiff's condition based on a previous examination of March 1, 1994, Dr. Kulak stated that plaintiff could not lift and carry more than fifteen pounds, could stand and/or walk up to six hours per day, could sit without limitation, and could push and pull only with his upper extremities. Before the July 6, 1995 hearing before Judge Dorsey, Dr. Kulak wrote that plaintiff "cannot stand beyond short period of time." He added that plaintiff could not work five days a week full-time, seated for at least six hours in an eight hour day frequently lifting up to five pounds and occasionally lifting ten pounds because

---

**12.** Some courts give considerable weight to a plaintiff's prior representations. The Fifth Circuit, for example, has held that the application for, or receipt of, social security benefits creates a "rebuttable presumption" that the claimant is judicially estopped from then asserting that he is a "qualified individual with a disability." *Cleveland v. Policy Management Systems Corp.*, 120 F.3d 513, 518 (5th Cir.1997). Along the same lines, the Eleventh Circuit has held that "an ADA plaintiff is estopped from denying the truth of any statements made in her disability application." *Talavera v. School Bd. of Palm Beach County*, 129 F.3d 1214, 1220 (11th Cir.1997).

Other courts simply confine their analyses to the facts of each case. In *Swanks v. Washington Metropolitan Area Transit Auth.*, 116 F.3d 582, 587 (D.C.Cir.1997), for example, the D.C. Circuit held that a claimant's statements in support of disability claims can be relevant in ADA suits. If, for example, a claimant told the SSA that he or she could not perform the essential features of the job even with accommodation, that claimant might be barred from asserting, for ADA purposes, that he or she could perform the job with accommodation. *Id.* Similarly, the Seventh Circuit has held that a claimant's representations to the SSA are "some evidence" of that claimant's ability to perform the essential functions of a job. *McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159, 1164 (7th Cir.1997) (citing *Weigel v. Target Stores*, 122 F.3d 461, 467–68 (7th Cir.1997)). *See also Blanton v. Inco Alloys Int'l, Inc.*, 108 F.3d 104, (6th Cir.1997) (plaintiff's prior representations estopped him from claiming that he was qualified for former position, but he could assert that he was qualified for vacant light duty position); *Robinson v. Neodata Services, Inc.*, 94 F.3d 499, 501–02 (8th Cir.1996) ("[a]t best, the Social Security determination was evidence for the trial court to consider in making its own independent determination").

**13.** The opinions of Dr. Newman will not be addressed here because he was *defendant's* consulting physician.

the plaintiff "[m]ust be seated while working—all the time." He further added that plaintiff could not work five days a week, seated for six hour in an eight hour day, frequently lifting ten pounds and occasionally lifting twenty pounds because plaintiff "[c]annot stand for 2 hours." As of June 29, 1995, Dr. Kulak did not feel that plaintiff could stand at work.

Plaintiff's representations, including those in the July 1995 Social Security hearing that he needed a job in which he could sit all the time, are directly contrary to his subsequent deposition testimony, in which he stated that by December 1994 he could be on his feet for about four hours a day using his prosthesis, that his condition subsequently improved, and that by June 1995 he thought that he could work on his feet up to five hours a day. His deposition testimony also contradicts his physician's testimony, which stated, in no uncertain terms, that as late as June 29, 1995, plaintiff could not stand at work.

The preconditions for the application of judicial estoppel are present in this case. Under penalty of perjury, plaintiff and his treating physician made both written and oral statements in administrative proceedings before the SSA and the Workers' Compensation Board. Such statements were relied upon in decisions finding that plaintiff suffered from a disability and granting Workers' Compensation and Social Security benefits. In his decision on Social Security benefits, for example, Judge Dorsey specifically noted: "The claimant's testimony is credible and supported by the evidence regarding the impairments alleged." Yet the statements of plaintiff and Dr. Kulak that plaintiff was unable to walk and unable to work except in a sitting position are directly contrary to plaintiff's claims in this proceeding, including those through Edmund Provder, plaintiff's vocational expert, that plaintiff could stand or walk on his prosthesis. Based on the evidence presented by

plaintiff and his treating physician, Dr. Kulak,[14] I find that plaintiff is estopped from denying that he was capable of doing work in other a sedentary position.

This estoppel extends to Provder's report and testimony as well, as his representations in his deposition and expert report on behalf of plaintiff are flatly contradicted by numerous representations of plaintiff and plaintiff's treating physician. Since the judicial estoppel doctrine applies to inconsistent positions by a party, the doctrine also clearly applies to inconsistent positions taken by Provder on behalf of the plaintiff—especially where, as here, these inconsistencies suddenly blossom in opposition to a summary judgment motion. *See Simon v. Safelite Glass Corp.,* 128 F.3d 68 (2d Cir.1997).

## "REASONABLE ACCOMMODATION" UNDER THE ADA

The question now becomes whether a possible restructuring of his job to sedentary, or "more sedentary" duties, would allow plaintiff to "perform the essential functions of [the Head Custodian] job, either with or without a reasonable accommodation."

An employer is not required to eliminate essential functions from a job in order to accommodate an individual with a disability. *Borkowski,* 63 F.3d at 140. Thus, this Court must determine what constitutes the "essential functions" of the Head Custodian job, and whether the District could restructure the position to "more sedentary" duties without stripping the position of its essential functions.

While the ADA itself does not define the term "essential functions," the regulations promulgated by the Equal Employment Opportunity Commission (EEOC) implementing the ADA provide as follows:

(n) Essential functions—

(1) In general. The term essential functions means the fundamental job duties of

---

14. In support of his contentions in this case, plaintiff offers the deposition testimony of Dr. Kulak that his "total disability" assessment of plaintiff was made, at least on one form, by his secretary, "in an arbitrary manner." Plaintiff further contends that his July 1994 application to the SSA for reconsideration was filled out by his

attorney, Christopher Kraft; plaintiff claims he merely signed the blank application. Plaintiff, however, cannot now disavow such representations by asserting that they were made unwittingly, especially in light of reliance of the Workers' Compensation Board and the Social Security Administration upon them.

the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2. In this case, the District's written job description states that it involves "responsibility for supervising and performing routine building cleaning and semi-skilled maintenance tasks." The job "involves the general supervision, care, maintenance and protection of the school building which may include the efficient performance of a variety of groundskeeping activities." According to the description, therefore, while supervision is an important part of the job, physical labor is an essential component. Further, while the "typical work activities" include a variety of administrative and super-

visory duties, they also include a number of duties that cannot be performed from a sitting position. For example, the Head Custodian is required to perform chores such as sweeping, dusting, waxing, mopping, repairing furniture and equipment, mowing lawns, cultivating trees and shrubs, removing snow.

While plaintiff contends that before his accident, he did not perform all of the "typical work activities" listed in the job description, plaintiff acknowledges that the job has always required a great deal of physical activity, including standing and walking. Indeed, when he first started as Head Custodian, other than the two hours and forty-five minutes that he spent doing paperwork, on the phone, at lunch, and on break, plaintiff spent the remainder of his 8 1/2 hour day on his feet performing his duties. Moreover, after 1989, plaintiff spent even less time on administrative matters—after 1989 he would spend approximately three days per week on his feet. The physical responsibility of course increased dramatically after the expansion of the high school.

In addition, in his deposition, plaintiff testified to what he felt were the "essential functions" of the position. This testimony included many of the duties from the job description requiring physical labor. While plaintiff's testimony does not, of course, define what functions were "essential" in the sense of the word contemplated by the ADA, plaintiff's testimony does indicate the functions he thought were important and the duties on which he had spent his time. Thus, plaintiff, too, felt that the physical labor that he had performed was an important part of the position. While in his Affidavit in Opposition, plaintiff emphasizes the supervisory over the physical duties of the Head Custodian position, it is well settled in this Circuit that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir.1997) (quoting *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 619 (2d Cir.1996)).

As the plaintiff acknowledged in his deposition, and as this Court must thus accept, the Head Custodian position required extensive physical labor in addition to supervisory responsibilities. Further, while Reginald Dolson, the Head Custodian at the Round Hill School through August 1, 1995, viewed the Head Custodian position as mainly supervisory, he does not contest plaintiff's description of the duties plaintiff performed as Head Custodian of the High School. Significantly, plaintiff's description of the amount of time that he spent on his feet and doing physical labor is undisputed.

A restructuring of the Head Custodian job to accommodate plaintiff, therefore, would have required the District to completely revamp the position, stripping it of most of the physical labor and many of the duties that are contemplated by the job. The ADA does not require these measures.

■ Having decided that the ADA does not require the District to restructure the Head Custodian position to a sedentary one, I now turn to the other "reasonable accommodations" raised by plaintiff. It is the plaintiff's burden to identify a reasonable accommodation. *Borkowski*, 63 F.3d at 138. This is not a heavy burden. Plaintiff need only suggest the existence of a plausible accommodation, the costs of which, facially, do not exceed its benefits. *Id. See also Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir.1991). Under the ADA, "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

Other than requesting that the District restructure the Head Custodian job, plaintiff has also suggested reassignment of the physical Head Custodian duties to other staff; transfer to the Head Custodian position in a different school within the District; retraining to a more sedentary job, such as a courier or a bus dispatcher; or further extending his leave of absence before terminating him. I address plaintiff's suggestions in turn.

■ Plaintiff first suggests reassignment of the Head Custodian's physical duties to other staff. This, however, would require the elimination of essential functions of the Head Custodian job, which, as noted above, is not required under the ADA. *See also Borkowski*, 63 F.3d at 140 ("we have held . . . that individuals whose physical condition precludes them from engaging in heavy lifting, and who seek jobs for which such lifting is shown to be an essential function, need not be accommodated by shifting responsibility for the lifting to other individuals").

■ Plaintiff next suggests transfer to the Head Custodian position of the Round Hill School, where plaintiff asserts that the duties would be less demanding than those of the High School. This position, however, was filled through August 1, 1995 by Reginald Dolson.[15] While under the ADA, an employer may reassign an employee to a vacant position, the employer is required neither to create a new position for the employee nor to move another employee from a previously held position in order to accommodate the disabled employee. *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir.1997); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir.1996); *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir.1995). Consequently, because the key concern is whether accommodation was available to the individual at the time of termination, *see Dush v. Appleton Electric Co.*, 124 F.3d 957, 964 (8th Cir.1997), the District was not required to transfer plaintiff to the Head Custodian position at Round Hill.

■ A similar analysis applies to plaintiff's suggestions that the District retrain him for a more sedentary job, such as courier or bus dispatcher. As defendant points out, there is no courier position in the District. Moreover, the sole dispatcher position in the District was occupied through September 1996, and was a competitive Civil Service position for which plaintiff was not certified. Defendant has no obligation to retrain plaintiff for a position for which he is

---

**15.** Dolson's statement in his affidavit that he retired in 1994 is apparently incorrect in light of the May 15, 1995 letter he sent to Maureen Comer informing her that he would retire August 1.

not qualified. *See Quintana v. Sound Distribution Corp.,* No. 95 Civ. 0309, 1997 WL 40866, *6 (S.D.N.Y. Feb.3, 1997). Indeed, an employer need not "provide disabled employees with alternative employment when the employee is unable to meet the demands of his present position." *Christopher v. Laidlaw Transit Inc.,* 899 F.Supp. 1224, 1227 (S.D.N.Y.1995) (citing *Bates v. Long Island Railroad Co.,* 997 F.2d 1028, 1035 (2d Cir. 1993)). Here, plaintiff's requested accommodations are not required under the ADA.

■ Finally, plaintiff suggests that the District should have further extended his leave of absence before terminating him. Plaintiff does not, however, give a definite length of time for which the District should have extended his leave. At the time of his termination, the District had no indication how long plaintiff would continue to be unable to work. While Dr. Kulak wrote on September 14, 1994 that he hoped to have a return to work date for plaintiff after September 29, after that date he merely indicated that plaintiff could still only work in a sitting position. An employer is not required to allow a plaintiff an unpaid leave of indefinite duration. *Rogers v. International Marine Terminals, Inc.,* 87 F.3d 755, 759–760 (5th Cir.1996); *Hudson v. MCI Telecommunications Corp.,* 87 F.3d 1167, 1169 (10th Cir.1996). Plaintiff's proposed extension of his leave is not in these circumstances a "reasonable accommodation" required by the ADA.

### CONCLUSION

This Court is mindful of the problems of plaintiffs who must make certain representations to obtain disability benefits in order to avoid financial hardship. But Mitchell has gone beyond that point, arguing when required in one forum that he cannot stand and cannot walk, yet simultaneously arguing in a different forum that he can spend a good portion of the day on his feet doing substantial physical work. Because Mitchell is estopped to take such contrary positions in this Court, defendant's motion for summary judg-

ment is granted. The Clerk of the Court is directed to enter judgment for the defendant.

**SO ORDERED:**