Barbara G. CLARK, Plaintiff,

v.

**NEW YORK STATE ELECTRIC & GAS CORPORATION,**
Defendant.

No. 98–CV–164.

United States District Court,
N.D. New York.

Oct. 25, 1999.

64

Karen L. Kimball, Wynantskill, NY, for Plaintiff.

Hinman, Howard & Kattell, LLP, Binghamton, NY, Leslie Prechtl Guy, of counsel, for Defendant.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

### I. Background

Plaintiff Barbara G. Clark commenced the instant action on January 30, 1998, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), New York State Executive Law §§ 290 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), and the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.* ("FLSA") against the New York State Electric and Gas Corporation ("NYSEG"), alleging, *inter alia*, discrimination due to gender and disability, unlawful retaliation, and unlawful docking of pay. Plaintiff seeks monetary damages (compensatory and punitive) and reinstatement to her position (or an award of front-pay) with additional payment for overtime.

Defendant now moves for summary judgment pursuant to FED. R. CIV. P. 56 seeking dismissal of the Complaint.

### A. Facts

Plaintiff began her employment with NYSEG in 1980 as a teller clerk. Between 1980 and 1997 she received a number of promotions and merit based raises, eventually obtaining the position of meter services supervisor in Oneonta, New York, in 1994. Bruce Peer was Plaintiff's supervisor in Oneonta, until November 1996 when Kathryn King became the acting supervisor in Oneonta. Richard Cerchiara supervised Peer and King.

Jean Pearson, Senior Trainer of Meter Services, traveled around New York working with "field personnel" and evaluating "their training, tools, attitudes, procedures, strengths, weaknesses, etc. and made efforts to bring some consistency to the meter groups state wide." Pearson, Aff. ¶ 3. In late 1995 and early 1996 Pearson came to Oneonta to work with the meter groups. At this time, Pearson noted that there were problems in the group supervised by Plaintiff, *id.* ¶¶ 10–11, and told both Peer and Plaintiff that "there was going to be a mutiny" in Plaintiff's department. Peer Aff. ¶ 13. She also told Plaintiff she should "leave [her] job right now." Clark Dep., Feb. 25, 1999, p. 67. After this, Peer told Plaintiff to meet with Pearson regarding the problems. *Id.* ¶ 16. Pearson prepared a memo dated March 5, 1996, a copy of which was given to Plaintiff, documenting her appraisal of Plaintiff's department and the problems therein. *See* Pearson, Aff. Ex. A. Plaintiff believes this memo was written to retaliate for complaints Plaintiff made regarding Pearson's training session. Clark Aff. ¶ 31.

On April 24, 1996, Plaintiff submitted an injury report to Huemec Garcia, Plaintiff's acting supervisor while Peer was away on special assignment, complaining of numb-

ness and pain in both hands and arms. *See* Clark Aff. ¶ 31. At this point, she had not received any medical care for the condition and had not taken any time off due to her condition. *See* Clark Dep., Jan. 28, 1999, p. 56.

Between February and July 1996, Plaintiff's supervisors documented a number of complaints regarding Plaintiff's performance and response to criticism. For example Pearson met with Peer after her field evaluations and noted that "[f]or the most part, Barbara was angry and argumentative at this meeting. She appeared not to be listening to my suggestions." Pearson, Aff. ¶ 12. Richard Cerchiara, the Manager of Customer Satisfaction, Assistance and Training, also received complaints about Plaintiff's management of the Oneonta meter department. John De-Sarro, a manager in the Oneonta office, complained that Plaintiff was difficult to work with. *See* Cerchiara, Aff. ¶ 13. In response to a memo from Plaintiff requesting personnel from other divisions, DeSarro sent Cerchiara and Tum Curran, a NYSEG employee, an email, which stated:

> Tom, you and I have spoken regarding the local problem with the management of the meter [department]. I'll assist any [department] anytime they really need it. I don't think this is the case and my "support" is only making matters worse in my opinion. Please let me know how I can truly help the situation without a continuation of the ill feeling toward the meter [department] that pervades this division.

Cerchiara Aff., Ex. B.

In July, Cerchiara received a call from Cindy Allen, Corporate Stores Manager, requesting intervention into a personnel situation between Allen and Plaintiff because Plaintiff refused to release an employee who had been awarded a job in Allen's division. According to Cerchiara, Plaintiff "had failed to post the new vacancy and would be short-handed without this employee." Cerchiara Aff. ¶ 20. In mid July, Cerchiara and Peer decided to temporarily transfer Plaintiff to Binghamton, and told her this temporary reassignment was because (1) the Binghamton office needed help and (2) Plaintiff needed to get away from Oneonta because of "relationship problems there" and "concern about her ability to supervise her group successfully." Cerchiara Aff. ¶ 26; Peer Aff. ¶¶ 22, 25.

NYSEG denied Plaintiff's requests that she be excused from the temporary assignment and the reassignment be postponed for a week as well as requests for overnight accommodation and overtime pay for the commute hours. *See* Clark Aff. ¶¶ 44–49; Cerchiara Aff. ¶ 23. Plaintiff was given a company car for the commute. *See* Peer Aff. ¶ 24. Although Plaintiff claims she informed Peer of her health condition prior to her reassignment, Peer states that he was not aware that Plaintiff had any health concerns and had not received any medical documentation regarding health considerations by this time. *See* Peer Aff. ¶ 23. Plaintiff alleges that her temporary assignment to Binghamton aggravated her injury because it required additional keyboard time, travel time, and additional work hours. Both Peer and Cerchiara deny knowledge of Plaintiff's disability prior to her reassignment. *See* Peer Aff. ¶ 23; Cerchiara Aff. ¶ 33.

About the time of her temporary reassignment, Plaintiff agreed to undergo a "360° review," which is a "tool used by NYSEG whereby an employee with performance problems selects a number of peers and subordinates to complete a questionnaire about the employee's performance, skills and characteristics." Peer Aff. ¶ 21. The employee's supervisor participates and the feedback is used to prepare an "action plan" for improving performance. *See id.*

Plaintiff met with Dr. Elting on June 5, 1996 and was instructed to wear braces on both arms and to restrict her keying activity. Plaintiff states that she provided Peer

with a copy of this diagnosis[1] and informed him of the results of a follow up appointment. *See id.* ¶¶ 36–38.

While Plaintiff was reassigned, Defendant continued to receive complaints about Plaintiff's performance from her supervisors in Binghamton. *See* Peer Aff. ¶ 20.

On September 19, 1996 Plaintiff met with her Binghamton Supervisor, Frank Inglese, and informed him that she was having a great deal of pain in her neck and shoulders due to the extra keying and travel involved in the Binghamton assignment. *See* Cerchiara, Aff. ¶ 27. On September 25, Plaintiff met with Peer and indicated that she was going to raise a gender discrimination claim.[2] At this time Peer told Plaintiff that her supervisors were "receiving complaints about her relationships with other supervisors and the manner the department was being run." Cerchiara Aff. Ex. E. Basically, Plaintiff believed her reassignment was in retaliation for filing the April 24, 1996 injury report and that she was being discriminated against in her job because of her gender. Clark Aff. ¶ 51. The latter belief stemmed from the fact that other male supervisors were not temporarily reassigned. *See* Clark Dep., Feb. 5, 1999, pp. 11–12. Defendant's internal review of Plaintiff's reassignment indicated that it was premature, but not discriminatory. *See id.,* Ex. C.

In November of 1996, prior to her return to Oneonta, Cerchiara and Plaintiff discussed the perceived problems with Plaintiff's performance. At this time, Plaintiff understood, from conversations with both Peer and Cerchiara, that "she was going to have to improve [her] performance in order to stay in [her] job." Clark Dep. Feb. 5, 1999, p. 51–54. When Plaintiff returned to Oneonta she had a new acting supervisor, Kathryn King. On November 8, 1996, Plaintiff met with Peer and Greg Lapham to discuss her 360˘review. *See* Peer Aff. ¶ 28. At this time, Plaintiff offered a note from her Doctor restricting her keying activity to two hours per day and prohibiting overtime. Cerchiara stated that these were "the first medical restrictions I received about Barbara." Cerchiara Aff. ¶ 33.

Once Plaintiff returned to Oneonta, complaints from employees and peers regarding Plaintiff's performance continued. *See* King Aff. ¶ 16. By mid-December of 1996 it was apparent to King that Plaintiff's "performance problems were serious." King Aff. ¶ 20. Complaints included, but were not limited to, Plaintiff's inability (or unwillingness) to input information into a "Pen" scheduling device, *see* King Aff. ¶ 32; her unwillingness to schedule account collections as requested, *see* King Aff. ¶ 27, and her failure to schedule meter readings based on the "ten month no access list." King Aff. ¶ 29. According to Plaintiff, her relationship with King was strained and she received "hostile and derogatory" treatment from King due to her filing of the internal discrimination complaint. *See* Clark Aff. ¶ 66.

King's February 10, 1997 specific performance appraisal was critical and stated that "Barbara needs to demonstrate improvement in her relationship skills if she is to remain in her present position." King Aff. Ex. C. The appraisal further stated: "[e]ffective immediately I am requesting a daily log be kept detailing what she has accomplished toward her relationship building goals or what she has done to further their development." *Id.* Plaintiff's first set of logs was two weeks late; thereafter she did not maintain the logs. *See* King Aff. ¶ 34.

---

1. A copy of the prescription/diagnosis was not provided to the Court.

2. An email from Peer to Cerchiara, dated September 25, 1996, says "[Plaintiff] feels this is a female vs. male situation and that any problems she had with other supervisors were in this category[.] She intends to complain to Sandy Johnson (I will alert her first.)." Cerchiara Aff. Ex. E.

Plaintiff received a General Performance Appraisal on February 26, 1997. *See* King Aff., Ex. G. This appraisal indicated that Plaintiff "achieved planned results,"[3] and the narrative indicated that "Barb's performance as Meter Services Supervisor has declined in the past year...". In the review, Peer stated that Plaintiff's performance decline was due to several factors including relationships, credibility, lack of follow up and lack of teamwork. *See* Peer Aff. ¶ 31.

Plaintiff was told to prepare an "Action Plan" as part of the 360˜review conducted earlier in the year. Because Plaintiff failed to submit the Action Plan, King formulated an Action Plan and sent it to Plaintiff in an email on February 27, 1997. This email detailed King's continued dissatisfaction with Plaintiff's performance. *See* King Aff. Ex. H.

Plaintiff's struggles with tendinitis continued after she returned to Oneonta. Her hours were restricted by her doctor, as was her keying activity. Additionally, Plaintiff was dissatisfied with her treatment compared to the treatment she believed male employees (including her temporary replacement) received. Clark originally worked a split shift with a long break in the middle of the day to accommodate the hour restrictions. Due to Clark's dissatisfaction with this schedule, her work day was eventually shortened. Clark Aff. ¶ 61–69. All of Plaintiff's requests for accommodation were not met, for example, she never received the movable arm for her computer monitor that she requested. Clark Aff. ¶ 70.

In March and April of 1997, King and Cerchiara discussed discharging Plaintiff because her performance was not improving. *See* King Aff. ¶ 42, Cerchiara Aff. ¶ 47. King submitted a memorandum recommending termination March 27, 1997. This was not a final determination, however, as the termination had to be approved. Ultimately, William McCann, Cerchiara's

supervisor, approved the termination, which was finalized on June 10, 1997. *See* King Aff. ¶ 42; Cerchiara Aff. ¶ 48. Plaintiff went out on disability on April 30, 1997. *See* King Aff. ¶ 42; Cerchiara Aff. Ex. I. Because NYSEG has a policy of not terminating employee's while they are out on disability her termination was held in abeyance. *See* King Aff. ¶ 43. Plaintiff was examined by independent physicians in October and November of 1997. Although King was advised by these physicians that Plaintiff could return to work; Plaintiff did not return. *See* King Aff. ¶ 44. Plaintiff believed she was still out of work on doctor's orders because her workers compensation case was continued not dismissed and she had not received clearance to return to work from her physician. *See* Clark Aff. ¶ 72; Clark Aff. Ex. D. Because NYSEG no longer considered "disabled," she was terminated on December 10, 1997. Plaintiff's affidavit states that she "believe[s] there are treatments which would help [her] condition" that NYSEG "refused and continues to refuse to authorize," Clark Aff. ¶ 71; however, her deposition testimony unambiguously states that she is "completely disabled from doing any type of work at all," regardless of accommodation; and there is nothing at NYSEG she believes she could have done since April 1997. Clark Dep., Jan. 11, 1999, p. 19; Clark Dep. Mar. 11, 1999, p. 91. Plaintiff has been totally disabled since April 30, 1997.

## B. Procedural History

Plaintiff commenced this action on January 30, 1998. The parties have completed discovery. Presently before the Court is Defendant's motion for summary judgment on all claims.

## II. Discussion

### A. Compliance with Local Rules

The papers submitted to this Court by Plaintiff failed to conform to the stan-

---

**3.** According to Peer, this satisfactory rating "pertained to pre-set production goals that had been met by Barbara but the narratives made it clear that her management and interpersonal performance was not satisfactory." Peer Aff. ¶ 31.

dards set by the local rules or the Pro Se Handbook.[4] The Rules require text to be double spaced; the papers submitted by Plaintiff, including the 103 factual allegations in the Complaint, are not. *See* N.Y.N.D.L.R. 10.1. Moreover, the papers submitted by Plaintiff did not contain adequate citations (citations were often missing entirely or did not contain specific page references) to either supporting legal precedent or the evidentiary record, the existing citations were not in the proper form, and Plaintiff's attorney's affidavit improperly contained legal argument. *See* N.Y.N.D.L.R. 7.1(a)(1), 7.1(a)(2). The responsibility for consulting the local rules and submitting papers that conform to the clear standards set forth therein is on the parties, not the Court. Future non-compliance with the local rules will lead to rejection of papers and imposition of appropriate sanctions.

## B. Standard for Summary Judgment

The standard for summary judgment in employment discrimination cases is well-settled and need not be restated here. This Court has set forth the appropriate standard to be applied in numerous published decisions, *see Roman v. Cornell Univ.*, 53 F.Supp.2d 223, 232–33 (N.D.N.Y. 1999); *Phipps v. New York State Dep't of Labor*, 53 F.Supp.2d 551 (N.D.N.Y. June 24, 1999); *Riley v. Town of Bethlehem*, 44 F.Supp.2d 451, 458 (N.D.N.Y.1999), and will apply the same standard discussed in those cases to Defendants' motions for summary judgment.

With this standard in mind, the Court will now address the Defendant's Motion for summary judgment.

## C. Discrimination Claims

### 1. Title VII [5]

The burden shifting rubric for analyzing Title VII discrimination claims, set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is well-settled. Plaintiff initially has the de minimis burden of presenting a prima facie case of discrimination. If this burden is satisfied, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason" for the complained of action. *Id.* at 802, 93 S.Ct. 1817. To satisfy this intermediate burden, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 257, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden then shifts back to the plaintiff, who must be "afforded a fair opportunity to show that petitioner's stated reason for [the adverse action] was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817. Plaintiff may demonstrate that she has been a victim of intentional discrimination "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089 (citing *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817).

To satisfy the initial burden of proving a prima facie case, Plaintiff must establish (1) membership in a protected class; (2) qualification for the position; (3) an ad-

4. Plaintiff submitted the Complaint pro se. She has since retained an attorney and, in fact, her present attorney assisted her in preparing the Complaint. *See* Clark Dep. Mar. 11, 1999, pp. 86–87.

5. The elements of a discrimination claim are "virtually identical" under Title VII and New York State Law. *See, e.g., Kremer v. Chemical*

*Constr. Corp.*, 456 U.S. 461, 479, 102 S.Ct. 1883, 72 L.Ed.2d 262, *reh'g denied*, 458 U.S. 1133, 103 S.Ct. 20, 73 L.Ed.2d 1405 (1982); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir.1996); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 n. 4 (2d Cir.1995). Therefore, the foregoing analysis applies equally to Plaintiff's gender discrimination claim brought under New York Law.

verse employment decision; and (4) that the adverse decision took place under circumstances giving rise to an inference of discrimination. *See, e.g., Brennan v. Metropolitan Opera Assoc., Inc.,* 192 F.3d 310 (2d Cir.1999). Once the plaintiff has met this de minimis burden, *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994), the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for the action. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the employer meets its burden of production, the inference of discrimination raised by the prima facie case then drops out and the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason is merely a pretext for discrimination. *See id.* at 507–08, 113 S.Ct. 2742. Defendant alleges that Plaintiff cannot satisfy the initial burden because "due to her poor performance, interpersonal shortcomings, and her admitted inability to work after April 29, 1997"[6] Plaintiff is not qualified for the position of Meter Services Supervisor and there is no evidence that the reassignment or the discharge occurred under circumstances that permit an inference of gender discrimination. Def. Mem. of Law at 21.

▮ Even assuming, arguendo, that Plaintiff can establish the first three prongs of a prima facie case, Plaintiff has not presented any evidence that either her transfer or discharge took place under circumstances that give rise to an inference of discrimination. Plaintiff alleges that "[o]nce I was promoted to Meter Services Supervisor I began to notice I was not treated in the same way as the men in my Department," citing disparate treatment in the use of company vehicles, overnight stays in hotels, need to perform clerical duties, number of support staff, and level of respect. Clark Aff. ¶¶ 16–17. Plaintiff offers no evidence to support these allega-

tions. *See, e.g., Brennan,* at 317. Even if they are taken as true, the allegations of disparate treatment are not tied to either Plaintiff's temporary reassignment or discharge. Plaintiff offers no connection between the complained behaviors and the "adverse employment action." To prevail on a disparate treatment claim under Title VII Plaintiff must prove adverse employment action (temporary reassignment or discharge). *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 159 (2d Cir.1999). Plaintiff fails to make this connection and thus, she has not shown a prima facie case.

▮ Assuming, arguendo, that Plaintiff has established a prima facie case, the burden shifts to Defendant to articulate a legitimate non-discriminatory reason for its actions. Here, Defendant asserts that Plaintiff was terminated for performance reasons. This is sufficient to satisfy its burden under the McDonnell Douglass scheme. Thus, the onus reverts to Plaintiff to demonstrate that discrimination is the more likely reason for the adverse employment action she suffered. *See Hicks,* 509 U.S. at 515, 113 S.Ct. 2742. Plaintiff fails to make a sufficient showing that NYSEG's proffered explanations for the temporary reassignment and discharge are false, or that these actions were "mere pretext," masking discrimination. *Id.*

With respect to her temporary reassignment, Plaintiff admits that she was given business reasons for the transfer—the company's need in Binghamton and her relationship problems in Oneonta. *See* Clark Aff. ¶ 44; Clark Dep., Geb. 5, 1999, p. 6–12. Plaintiff claims that Peer's reasons for the transfer were disingenuous because of his "conversation [and] mannerisms." *See* Clark Dep., Feb. 5, 1999, p. 8. This disbelief, combined with the fact that other male supervisors in Oneonta were not moved out of their positions, is the basis of Plaintiff's claim that her reassign-

---

**6.** Plaintiff is permanently disabled and cannot do any type of work, regardless of accommodation, and has been so disabled since April 30, 1997. *See* Clark Dep. January 11, p. 18–20.

ment was discriminatory.[7] *See* Clark Aff. ¶ 51. The evidence demonstrates, however, that the male supervisors who were not moved did not have experience in the consumer affairs department (which was necessary for the temporary reassignment in Binghamton) and Plaintiff has not offered any evidence showing that these male supervisors had "relationship problems" warranting a temporary reassignment. *See* Clark Dep., Feb. 5, 1999, pp. 11–12. In light of Plaintiff's admission that there were business reasons for her transfer, the complete lack of evidence that the transfer was motivated by her gender, and the well documented records of Defendant indicating that Plaintiff's transfer was for business reasons. No fair minded jury reasonably could conclude that the real reason for plaintiff's transfer was unlawful gender discrimination.

For similar reasons, Plaintiff has not established that the performance reasons outlined to support her discharge were a smokescreen behind which gender discrimination lurked. Plaintiff offers no evidence to support a finding that she was discharged due to her gender rather than her performance. Evidence suggesting that Defendant's performance complaints were pretext for discrimination is also notably absent. While Plaintiff believes she was reassigned and discharged because of her gender, her beliefs and conclusory allegations do not support a showing that NYSEG's articulated reasons for plaintiff's reassignment and discharge were a pretext for discrimination. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995) ("[t]he party opposing summary judgment may not rely simply on conclusory statements" or "unsupported assertions"); *Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 285 (S.D.N.Y.1999); *Johnson v. New York*

*Hosp.*, 1998 WL 851609 (S.D.N.Y. Dec.9, 1998) (summary judgment granted to employer in ADA case where plaintiff's conclusory allegations failed to demonstrate that the nondiscriminatory reason proffered by employer was a pretext for discriminatory treatment), *aff'd*, 1999 WL 668121 (2d Cir. Aug.20, 1999)(Table). The facts reveal that during 1996 and 1997 Defendant was dissatisfied with Plaintiff's performance. This dissatisfaction was repeatedly communicated to Plaintiff. In fact, the evidence shows that Plaintiff was aware that if her performance did not improve, she would be discharged. *See, e.g.,* Specific Appraisal Report, Feb 10.1997, King Aff. Ex. C. Furthermore, the fact that Plaintiff's supervisor was female, as was her permanent replacement tends to undermine her claim for gender discrimination. *See, e.g., Noyer v. Viacom, Inc. MTV*, 22 F.Supp.2d 301, 307 (S.D.N.Y. 1998)(If defendants were motivated as plaintiff claims by animus against women or pregnant women or mothers, rather than by a desire to utilize Lerer more frequently regardless of Lerer's gender, they would not have been likely to replace someone in plaintiff's high position with members of the very same protected classes they allegedly discriminate against) (citing *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 107 (2d Cir.1989)). In short, Plaintiff presents no factual basis on which a rational finder of fact could infer that her discharge was discriminatory or "imply pretext masking unlawful discrimination." *See Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir.1997). Accordingly, Defendant's motion for summary judgment on Plaintiff's Title VII claim is granted.

**2. ADA Claim [8]**

 It is unclear whether Plaintiff's discrimination claim under the ADA alleg-

---

**7.** Plaintiff sets out numerous bases for her multiple discrimination claims, however, most are unrelated to her temporary reassignment and discharge (the "adverse employment actions"). Plaintiff testified that all of her supervisors from the period she worked

as Meter Services Supervisor (September 1994 to December 1997) discriminated against her. *See* Clark Dep., Feb. 5, 1999, p. 16.

**8.** It is well established that the legal standard for a discrimination claim under the ADA and

es that NYSEG discriminated against her because it failed to provide reasonable accommodations due to her disability, *see* 42 U.S.C. § 12112(5)(a), or that she was discriminated against because she was discharged on the basis of her disability. *See* 42 U.S.C. § 12112(a). The Court will address both.

### a. Discharge

■ The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees...." 42 U.S.C. § 12112(a). In order to establish a prima facie case of discriminatory discharge under the ADA, Plaintiff must establish that: (1) her employer is subject to the statute under which the claim is brought; (2) that she is an individual with a disability within the meaning of the statute, (3) that, with or without reasonable accommodation, she could perform the essential functions of the job, and (4) that the employer had notice of Plaintiff's disability and failed to provide such accommodation. *See Ryan v. Grae & Rybicki P.C.*, 135 F.3d 867, 869–870 (2d Cir.1998); *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144 (2d Cir.1998). The Plaintiff bears the initial burden of establishing a prima facie case. *See Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 383 (2d Cir.1996). In this case, the first prong is undisputed.

With respect to the second prong, however, Defendant argues that Plaintiff does not have a disability, within the meaning of the ADA. Defendant further argues that even if Plaintiff was found to be disabled under the ADA, she is not a "qualified individual with a disability" because, by her own admission, she is totally disabled and, thus, cannot perform the essential functions of the Meter Services Supervisor position, with or without reasonable accommodation. *See* Clark Dep., Jan. 11, 1999, p. 19; Clark Dep. Mar. 11, 1999, p. 91.

■ Assuming, arguendo, that Plaintiff is disabled within the meaning of the ADA, Plaintiff cannot establish that she is a "qualified individual with a disability" such that she can bring a claim for discrimination under the ADA. *See* 42 U.S.C. § 12112(a); *Parker v. Sony Pictures Entertainment, Inc.*, 19 F.Supp.2d 141, 147 (S.D.N.Y.1998). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(m). The discharge of an individual who is totally disabled and thus, unable to perform any job, no matter what its essential function, cannot be discriminatory "even where the individual is fired because of the disability." *Belgrave v. City of New York*, 1999 WL 692034 at * 148 (E.D.N.Y. Aug.31, 1999) (citing *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481–82 (9th Cir.1996)). Plaintiff claims that she is permanently disabled and unable to return to work, even with accommodations. Clark Dep., Jan. 11, 1999, p. 19; Clark Dep. Mar. 11, 1999, p. 91. Because Plaintiff is totally disabled, and cannot perform her job with or without reasonable accommodation, she is not a "qualified individual with a disability" with-

New York State Executive Law are the same. *See, e.g., Powers v. Polygram Holding, Inc.*, 40 F.Supp.2d 195, 202 (S.D.N.Y.1999); *Disanto v. McGraw–Hill, Inc./Platt's Div.*, 1998 WL 474136, *6 n. 4 (S.D.N.Y. Aug.10 1998); *McIntosh v. Brookdale Hosp. Med. Ctr.*, 942 F.Supp. 813, 822 (E.D.N.Y.1996), aff'd., 125 F.3d 844 (2d Cir.1997) (Table). The Court notes that the definition of disability under New York's Executive Law is less stringent than that under the ADA. *See Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 153 (2d Cir.1998); *State Division of Human Rights on Complaint of McDermott v. Xerox Corp.*, 65 N.Y.2d 213, 218, 491 N.Y.S.2d 106, 480 N.E.2d 695 (1985). However, the definition of disability was not dispositive in this case, thus, the foregoing analysis applies to Plaintiff's New York claim for discrimination based on her disability.

in the meaning of the ADA and, therefore, cannot succeed on her claim for discrimination based on the ADA. *See Jett v. Longs Drug Stores Corporation,* 166 F.3d 1217 (9th Cir.1999) (Table); *Pena v. Houston Lighting & Power Co.,* 154 F.3d 267, 269 (5th Cir.1998) ("Because Pena specifically represented that he could not perform his job with or without reasonable accommodation, he cannot demonstrate that he is a 'qualified individual with a disability' under the ADA."); *Friedman v. Consolidated Edison Co. of New York,* 1999 WL 511962, *10 (S.D.N.Y. July 20, 1999).

Moreover, if Plaintiff had established the elements of a prima facie case, the burden would shift to the Defendant to articulate a legitimate non-discriminatory reason for its actions. Defendant has satisfied this burden by presented well-documented complaints regarding Plaintiff's performance. The burden thus reverts to the Plaintiff to establish that discrimination is the more likely reason for Defendant's adverse employment actions. Plaintiff has not satisfied this burden because she has not alleged sufficient facts on which a rational finder of fact could conclude that the legitimate business reasons for plaintiff's termination-her performance-were pretextual. Plaintiff's conclusory allegations are not enough to create a material issue of fact. *See Goenaga,* 51 F.3d at 18. Thus, Plaintiff has not upheld

her burden. *See Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 188 (2d Cir.1992) ("mere knowledge of disability cannot be sufficient to show pretext") (quoting *Christopher v. Adam's Mark Hotels,* 137 F.3d 1069, 1073 (8th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 62, 142 L.Ed.2d 49 (1988)); *Brower v. Continental Airlines,* 1999 WL 640028 (E.D.N.Y. July 29, 1999); *Sutherland v. New York State Dept. of Law,* 1999 WL 314186, *9 (S.D.N.Y. May 19, 1999), *recon. denied,* 1999 WL 600522 (S.D.N.Y. Aug.10, 1999). Accordingly, Defendant's motion for summary judgment is granted with respect to Plaintiff's claim of discrimination under the ADA.[9]

### D. Retaliation [10]

#### 1. Title VII Claim

Title VII provides that it "shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [such employee] has opposed any practice made an unlawful practice by this subchapter." 42 U.S.C. § 2000e-3(a). Plaintiff contends that NYSEG violated this provision by retaliating against her for complaining about and filing charges concerning the gender discrimination.

The Defendant notes that the EEOC charge did not include any allega-

---

9. Plaintiff makes several factual allegations that Defendant failed to provide reasonable accommodations necessary for her disability, in violation of 42 U.S.C. § 12112(5)(a). For example, Plaintiff claims she asked for her office to be reorganized, requested, *inter alia,* a phone headset, longer telephone cord and lower desk and that none of these requests were satisfied on a timely basis. *See* Clark Aff. ¶¶ 25–26. Most of these accommodations had been made when Plaintiff returned from Oneonta. *Id.* Plaintiff's complaint can be read to allege that NYSEG violated the ADA by failing to provide Plaintiff with "reasonable accommodation" in light of her disability. To state a claim for discrimination based on lack of reasonable accommodation under the ADA, however, plaintiff still must establish a prima facie case, as defined above. *See*

*Mitchell v. Washingtonville Cent. School Dist.,* 992 F.Supp. 395, 405 (S.D.N.Y.1998). As discussed above, Plaintiff cannot establish a prima facie case because she is not a "qualified individual" within the meaning of the ADA because she is totally disabled and therefore, cannot perform the "essential function" of her prior position "with or without reasonable accommodation." *See, e.g., Belgrave,* 1999 WL 692034 at * 148.

10. New York Courts apply the same analysis for retaliation claims as are applied under Federal Law. *See Powers v. Polygram Holding, Inc.,* 40 F.Supp.2d 195, 202 n. 2 (S.D.N.Y. 1999). Therefore, the foregoing analysis applies to Plaintiff's claims of retaliation under New York Law.

tions of retaliation. Def. Mem. of Law at 16. A district court "only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is reasonably related to that alleged in the EEOC charge." *Butts v. New York Dep't of Housing Preservation & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993) (internal quotations omitted). This limit on jurisdiction requires a Title VII plaintiff to exhaust administrative remedies prior to bringing suit in Federal Court. The requirement both encourages settlement and provides notice to the party charged with a violation. *See id.*

The EEOC complaint "must be sufficiently precise to identify the aggrieved individual and the agency and to describe generally the action(s) or practice(s) that form the basis of the complaint." 29 C.F.R. § 164.106(c). The Plaintiff in this case filed a charge with the EEOC on March 7, 1997 claiming that she was subjected to "different working terms and conditions of employment than a male who has worked as a Meter Supervisor." Johnson Aff. Ex. B. Notably, the alleged retaliation occurred prior to time she filed her charge with the EEOC. Plaintiff does not claim retaliation in this EEOC charge and only mentions the temporary reassignment with regards to her disability claim, discussed later in this decision. Because of this, the Court will not consider Plaintiff's retaliation claim with respect to her temporary reassignment.[11] *See Butts*, 990 F.2d 1397.

■ The Court recognizes three exceptions to the exhaustion requirement, for conduct "reasonably related" to claims filed with the EEOC. *See id.*, 990 F.2d at 1402. One such exception includes an allegations of retaliation stemming from the filing of the EEOC charge itself. *Id.* Therefore, the Court will consider Plaintiff's allegation that she was discharged in retaliation for filing the charge with the EEOC.

■ The *McDonnell Douglas* burden shifting scheme set forth above also applies to retaliation claims. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998). To establish a prima facie case of retaliation, an employee must show (1) participation in a protected activity known to defendant; (2) an employment action disadvantaging the Plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *See id.; Tomka v. Seiler Corp.*, 66 F.3d 1295, 1309 (2d Cir.1995). Either direct evidence of retaliatory animus or an indirect showing that a "protected activity was followed closely by discriminatory treatment" can establish the necessary causal connection. *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991) (citing *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111 (2d Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987)).

■ The third element, however, is disputed. NYSEG argues that Plaintiff has not shown a causal connection between the protected activity (filing of the complaints) and her discharge. *See* Def. Mem. of Law at 24. Plaintiff, on the other hand, contends that the timing of her discharge establishes the necessary causal nexus.

---

11. Significantly, the timing of Plaintiff's reassignment fails to support a retaliation claim. Plaintiff was temporarily reassigned July 29, 1996 and her internal complaint (the alleged basis of retaliation) was not filed until October 6, 1996. *See* Johnson Aff. Ex. A. Plaintiff does not allege that she reported or discussed her gender complaints prior to reassignment. Her first allegation of discrimination appears to be a complaint at a meeting with Cerchiara in August, where she was protesting reassignment. *See* Clark Aff. ¶ 51. Moreover, affidavits of Plaintiff's supervisors indicate that they did not become aware of Plaintiff's discrimination complaints until even later. *See* Cerchiara Aff. Ex. E (email from Peer, dated September 25, 1996). Due to this, Plaintiff would not be able to establish the second, third or fourth elements of a retaliation claim. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998); *see also, Fitzgerald v. Henderson*, 36 F.Supp.2d 490, 500 (N.D.N.Y. 1998).

*See* Pl. Mem. of Law at 6. Plaintiff filed the EEOC charge on March 7, 1997 and was actually discharged on December 10, 1997. However, the discharge was delayed due to NYSEG's policy of not terminating employees who are out on disability, *see* King Aff. ¶ 43, and Plaintiff's direct supervisor, King, had compiled a packet of documentation supporting Plaintiff's termination by March 27, 1997. *See* Kimball Aff. Ex. F. Although temporal proximity between protected activity and adverse action is circumstantial evidence of a causal connection, timing alone does not necessarily establish the requirement. *See Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85–86 (2d Cir.1990) (finding that employee who was terminated three months after age discrimination complaint filed could not establish causal connection); *Belgrave*, 1999 WL 692034, *35. Plaintiff's implication that the March 27, 1997 memorandum is proof of retaliation because it was circulated approximately 20 days after Plaintiff's EEOC charge was filed fails to take into account the substance of the memorandum itself. The packet of papers compiled by King supporting Plaintiff's termination, which were attached to the March 27 memorandum is notably absent from the record.[12] The memorandum, however, which has been provided, states that the compiled material includes complaints regarding Plaintiff's performance from January 1, 1996 to March 26, 1997, a period which extends well before Plaintiff's EEOC charge was filed. *See* Kimball Aff., Ex. F. Evidence provided by the Defendant indicates that this memorandum was not the first writing to suggest that Plaintiff's performance problems may warrant her termination. *See, e.g.,* Kimball Aff. Ex. D. Looking at the March 27 memorandum as a whole undermines Plaintiff's

claims that the performance complaints were manufactured to explain away an actually discriminatory discharge. Moreover, Plaintiff's discharge was not contemporaneous to the filing of the EEOC charge, she was not officially terminated until December 10, 1997, approximately nine months after the EEOC charge was filed. The March 27 memorandum recommended termination, it was not a final action. Plaintiff's termination was not approved until June 10, 1997, more than 3 months after she filed her EEOC charge and she was not actually terminated until December 10, 1997, almost 9 months after the charge was filed. Because Plaintiff has not established the necessary causal connection, she has not established a prima facie case of retaliation. *See, e.g., Rodriguez v. HRA ACS*, 1999 WL 568019, *2 (2d Cir. July 30, 1999) ("Even so construed, Rodriguez's retaliation claim is insufficient because Rodriguez provided nothing prior to or in response to the summary judgment motion linking his termination with the EEOC complaint.").

█ Assuming, arguendo, Plaintiff could establish a prima facie case, the burden shifts to Defendant to articulate a legitimate non discriminatory reason for its action. Because NYSEG articulated specific, legitimate, and non-discriminatory reasons for Plaintiff's discharge, the burden shifts back to Plaintiff to show that the proffered reasons are pretextual, and that, more likely than not, the true reason for her discharge was unlawful retaliation. *See Scaria*, 117 F.3d at 654. Plaintiff again has failed to allege or argue any fact or theory on which a rational fact finder could conclude that Defendant's proffered reasons for her discharge were false, mere smokescreens for retaliation.[13]

---

**12.** The memorandum states "[a]ttached please find the documents I've prepared to make the case for Barbara Clark's termination of employment...." *See* Kimball Aff., Ex. F.

**13.** Plaintiff's memorandum of law states "[p]laintiff has a 17 year history of merit

raises and promotions that ended in termination for 'performance issues'". These performance issues came to a head after she filed her discrimination complaint. "of these performance issues were ever raised with her prior to her making a claim of sex discrimination to Cerchiara and Brasted informally...." Pl. Mem. of Law at 7. Plaintiff did not

The only "evidence," other than timing, Plaintiff offers to support her allegation that Defendant's explanations for her discharge were pretextual is her "satisfactory" rating in the February 24, 1997 review (before filing of the EEOC charge). *See* Pl. Mem. of Law at 6. In making this argument Plaintiff looks to one portion of the review rather than taking the review as a whole. The employment evaluation, which rated Plaintiff's performance as "satisfactory" (insofar as the box "Achieved planned results" is checked) is not overwhelmingly positive. The narrative portion indicates that Plaintiff's performance "has declined in the past year," and that "[i]mmediate improvement in both areas [personal skills and supervisory difficulties] will be necessary if Barbara is to continue in her supervisory position." *See* Kimball Aff., Ex. D. Thus, Plaintiff was on notice, prior to filing her EEOC charge, that NYSEG had contemplated removing her from her supervisory position.

Construing the record in the light most favorable to the Plaintiff, as required on a motion for summary judgment, the Court is left to balance Defendant's overwhelming documentation of Plaintiff's performance difficulties with Plaintiff's conclusory allegations that her discharge was retaliatory. Allegations that Defendant's justifications are pretextual, combined with Plaintiff's history of satisfactory performance and the timing of the complaint and discharge are not enough to preclude granting summary judgment, *see Holt v. KMI–Continental*, 95 F.3d

123, 130 (2d Cir.1996), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Aldrich v. Randolph Cent. School District*, 963 F.2d 520 (2d Cir.), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359; *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). The evidence before the Court is insufficient to enable a jury to reasonably conclude that a retaliatory motive led to Plaintiff's discharge. *See, e.g., Reilly v. Metro–North Commuter R.R. Co.*, 1996 WL 665620, *14 (S.D.N.Y. Nov.15, 1996) ("The timing of events alone, even if sufficient to meet plaintiff's prima facie burden, cannot defeat summary judgment in the face of defendant's proffered legitimate reason."). Accordingly, Defendant's motion for summary judgment is granted.

**2. ADA Claim**

Defendant next moves for summary judgment on Plaintiff's retaliation claims under the ADA, arguing that Plaintiff's claims should be dismissed because she cannot establish a prima facie case of retaliation under the ADA, 42 U.S.C. § 12101 *et seq.*

■ It is appropriate to use the Title VII burden shifting framework, outlined above to analyze a claim of retaliation under the ADA. *See Sarno*, 183 F.3d at 159.

■ It is unclear what "protected activity" forms the basis of Plaintiff's ADA retaliation claims. Prior to her temporary

---

indicate the date on which this "informal" claim was made or cite to any evidence that would provide such a date. After combing the record, the first allegation the Court finds is Plaintiff's informal complaint in a discussion with Cerchiara in August of 1996. *See* Clark Aff. ¶ 51. The first documented complaint, although still informal, was made in Plaintiff's discussion with Peer on September 25, 1996. *See* Cerchiara, Aff. Ex. F. Both complaints were made after Plaintiff's temporary reassignment to Binghamton. The Court's review of the record further indicates that, contrary to Plaintiff's argument, performance issues had been raised with Plaintiff

on numerous occasions prior to her reassignment. *See, e.g., Pearson* Aff. Ex. A (memorandum to Peer from Pearson regarding Meter Services Recommendations indicating discussions with Clark); Peer Aff. ¶ 15 (discussion with Clark regarding Pearson's concerns); Peer Aff. ¶ 22 (discussion with Clark regarding reassignment, indicating it was due in part to "relationship problems"); Clark Aff. ¶ 44; Cerchiara Aff. ¶ 26 (stating he told Plaintiff her reassignment was due in part to "concern about her ability to supervise her group successfully and to interact with other supervisors.").

reassignment, Plaintiff made an informal complaint about pain and numbness in her arm while typing. Plaintiff does not establish a causal connection between this informal complaint and her reassignment [14] and thus, she cannot establish a prima facie that her reassignment was retaliatory.

Similarly, it is unclear what protected activity Plaintiff believes led to her allegedly retaliatory discharge. After her return to Oneonta, Plaintiff's tendinitis condition became more aggravated, she began to seek medical assistance, and eventually her work schedule was adjusted to accommodate the condition. Although scheduling was an area of conflict between Plaintiff and King, it was not a primary performance complaint. Assuming Plaintiff's requested accommodations are the "protected activity," Plaintiff has not shown a causal connection between these requests and her eventual termination. The performance complaints regarding Plaintiff focused on interpersonal communication skills, organization, and basic ability to perform the supervisory position rather than scheduling and/or inability to perform certain tasks due to tendinitis.[15] Documentation of these performance complaints began prior to the time Plaintiff's activities were limited by tendinitis. Looking at the record as a whole, and taking the facts in the light most favorable to the Plaintiff, it is difficult to find a causal connection between Plaintiff's allegations of discrimination and the adverse employment actions of NYSEG. However, assuming the necessary causal connection can be shown, Plaintiff faces the now familiar hurdle—pretext. In order to succeed on a retaliation claim, Plaintiff must provide evidence on which a rationale fact finder could determine that NYSEG's as-

serted justifications for her termination were pretextual. *See Tomka,* 66 F.3d at 1308; *Quinn,* 159 F.3d at 768; *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276 (2d Cir.1998). Plaintiff has not done this. Therefore, Defendant's motion for summary judgment on the ADA retaliation claim is granted.

### E. Family Medical Leave Act

"[T]he FMLA was enacted because of Congress's view that 'there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods.'" *Sarno,* 183 F.3d at 160. In an attempt to address this problem, the FMLA contains both "prescriptive" and "proscriptive" provisions. *See Belgrave,* 1999 WL 692034, * 42 (citing *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 160 (1st Cir.1998)). The proscriptive provisions create substantive rights, whereas the prescriptive provisions protect an employee from discrimination for exercising the substantive rights. *Id.* In this case, the basis of Plaintiff's FMLA claim is not articulated. Accordingly, it is unclear whether Plaintiff alleges that her discharge violated Section 2614 of the FMLA, insofar as she was never restored to her previous position, or that her discharge violated Section 2615(a)(2) of the act, insofar as her discharge was discriminatory. The Court will address both possibilities.

An employer covered by the FMLA is required to grant an "eligible employee" up to 12 weeks of leave during any 12–month period for, *inter alia,* "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C.

---

**14.** Plaintiff also alleges that the job reassignment aggravated her condition. This was not known prior to her reassignment, however, and would not be a valid basis for a retaliation claim. In fact, after Plaintiff made more formal complaints (meeting with Peer) the temporary reassignment ended and she returned to work in Oneonta.

**15.** Arguably, Plaintiff had difficulty inputting information into the pen scheduling device, which required keying, because of her disability. Plaintiff's unwillingness to do this, however, is only one of many complaints with her performance (others included not scheduling account collections).

§ 2615(D). The fact that NYSEG is a covered employer, 29 U.S.C. § 2611(4), and Plaintiff was an "eligible employee," 29 U.S.C. § 2611(2), as defined by the FMLA, is undisputed. Instead, this action questions whether Plaintiff's discharge violated her substantive rights under the FMLA or discriminated against her because of her exercise of her FMLA rights.

Substantive provisions of the FMLA, codified at 29 U.S.C. §§ 2611–2619, entitle eligible employees to temporary leave (up to 12 weeks), to certain continuing benefits, and to reinstatement to the same or an "equivalent position." Additionally, these provisions make it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under ... subchapter [I of the Act]." 29 U.S.C. § 2615(a)(1). The FMLA grants eligible employees affected by such unlawful conduct a private right of action for damages or equitable relief. *See id.* § 2617(a)(1). To the extent pertinent to this action, Section 2612 provides that:

> an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period ...
>
> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1)(D).

Section 2614 provides, in pertinent part:

> any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave—
>
> (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
>
> (B) to be restored to an equivalent position with equivalent employment benefits, pay, and to her terms and conditions of employment.

*Id.* § 2614(a)(1).

Pursuant to the FMLA, 29 U.S.C. § 2654, the Secretary of Labor has promulgated regulations at 29 C.F.R. Part 825, which provide instruction in interpreting the FMLA. Those regulations interpreting the return-from-leave provisions of the Act state, *inter alia,* that:

> [i]f the employee has been on a workers' compensation absence during which FMLA leave has been taken concurrently, and after 12 weeks of FMLA leave the employee is unable to return to work, the employee no longer has the protections of FMLA and must look to the workers' compensation statute or ADA for any relief or protections,

29 C.F.R. § 825.216(d), and that

> [i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA,

*id.* § 825.214(b).

In this case, the undisputed facts show that due to her disability, Plaintiff was removed from work by her physician on April 29, 1997; NYSEG informed Plaintiff that she was being placed on FMLA leave for 12 weeks; Plaintiff was statutorily entitled to no more than 12 work weeks of FMLA leave; Plaintiff was concurrently taking a workers compensation absence; and Plaintiff received 12 weeks of FMLA leave. In fact, Plaintiff was on paid leave for 7 months before she was terminated. Plaintiff now claims she is totally disabled. *See* Clark Dep., Jan. 11, 1999, p. 19; Clark Dep. Mar. 11, 1999, p. 91. These facts do not permit any inference that NYSEG "denied, restrained, or interfered with" Plaintiff's exercise or attempt to exercise any rights provided by the FMLA. *See Sarno,* 183 F.3d at 161. Moreover, the fact that Plaintiff was not restored to her position at the end of the 12–week period did not

infringe her FMLA rights—it is undisputed that at the end of that period she remained unable to perform the essential functions of her position. *See id.* Thus, under 29 C.F.R. §§ 825.216(d) and § 825.214(b), respectively, the FMLA did not entitle Plaintiff to be restored to her former position or to any other position.

 Moreover, it is not unlawful to terminate an employee while they are on FMLA leave, provided the taking of FMLA leave was not the cause for termination. *See Santos v. Knitgoods Workers' Union, Local 155,* 1999 WL 397500, *3 (S.D.N.Y. June 15, 1999). As Defendants indicate, the FMLA does not entitle an employee taking FMLA leave to any greater rights than employees who have not taken such leave. *See Carrillo v. National Council of Churches of Christ in U.S.,* 976 F.Supp. 254, 256 (S.D.N.Y.1997). In other words, an employee who is subject to termination due to performance problems will not be insulated from terminations by the FMLA. Plaintiff's discharge, therefore, did not violate the substantive provisions of the FMLA.

 An alternate theory of liability is that NYSEG discriminated against Plaintiff for taking FMLA leave. This is determined using the familiar *McDonnell Douglas* burden shifting analysis discussed above. *See Chaffin v. John H. Carter Co.,* 179 F.3d 316, 319 (5th Cir.1999); *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir.1999); *Hodgens,* 144 F.3d at 160; *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1325 (10th Cir.1997); *Belgrave,* 1999 WL 692034 at * 42. Because NYSEG has asserted a legitimate business reason for Plaintiff's termination and Plaintiff has failed to allege facts sufficient to withstand a motion for summary judgment that NYSEG's justification is pretextual, Plaintiff has not asserted a meritorious claim of discrimination under the FMLA. Accordingly, Defendant's motion for summary judgment on the FMLA claim is granted.

## F. Fair Labor Standards Act

 Finally, Plaintiff claims that NYSEG violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* The FLSA requires that employees who work in excess of 40 hours per week be paid at least one and one-half times their ordinary hourly wage for their overtime hours. *See* 29 U.S.C. § 207(a)(1) (1994). This requirement, however, does not apply to employees who serve, *inter alia,* "bona fide executive" positions and are paid on a salaried basis.[16] *See* 29 U.S.C. § 213(a)(1). Plaintiff was a salaried bona fide executive. Plaintiff alleges, however, that the exemption does not apply because she was told by her supervisor, King, that any time she took off for doctors appointments would have to be made up on the same day. *See* Complaint, ¶ 85. Plaintiff contends that this is equivalent to docking pay and, thus, exempt status should be denied because her salary was "subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.11(a).

 Plaintiff cannot succeed on this claim because her pay was not actually docked. In making the argument that "[i]t is not necessary to actually deduct the pay" in order to lose the exemption, Pl. Mem. of Law in Opp. to Summ. J., p. 11, Plaintiff overlooks recent Supreme Court precedent, which holds that exempt status will be denied only "if there is either [1] an actual practice of making ... deductions or [2] an employment policy that create[d] a 'significant likelihood' of such deductions." *Auer v. Robbins,* 519 U.S. 452, at 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *see also Ahern v. County of Nassau,* 118 F.3d 118, 121 (2d Cir.1997). Plaintiff was asked to schedule doctors appointments during her midday break, which she contends is equivalent to having her pay docked for taking time off for these appointments. However, Plaintiff's

---

**16.** Neither party disputes that Plaintiff was a salaried employee within the meaning of the FLSA. Therefore, the Court assumes that Plaintiff falls within the purvue of 29 U.S.C. § 213(a)(1).

pay was never docked and thus, the first prong of *Auer* is not satisfied. A finding of a "significant likelihood" pursuant to *Auer* requires the existence of a "clear and particularized policy—one which effectively communicates that deductions will be made in specified circumstances." *Auer*, 519 U.S. at 461, 117 S.Ct. 905 (internal quotation marks omitted). There is no evidence before this Court indicating that there was an employment policy requiring Plaintiff to make up time taken for Doctors appointments. King's pronouncement that time must be made up does not rise to the level of a "clear and particularized policy." *Id.* Because Plaintiff has not shown an actual practice or "significant likelihood" of pay docking, she falls within the bona fide executive exemption. *Id.* Accordingly, Defendant's motion for summary judgment on the FLSA claim is granted.

### III. Conclusion

Defendant's motion for Summary Judgment is GRANTED in its entirety and Plaintiff's Complaint is dismissed.

**IT IS SO ORDERED**